IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

|  |  |
|---|---|
| In re: <br><br> **GOURMET EXPRESS ACQUISITION FUND, LLC,** <br><br> Debtor. | Case No.: 15-13670 (NVA) |

* * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| In re: <br><br> **GOURMET EXPRESS HOLDINGS, LLC,** <br><br> Debtor. | Case No.: 15-13673 ( NVA) |

* * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| In re: <br><br> **GOURMET EXPRESS, LLC,** <br><br> Debtor. | Case No.: 15-13674 (NVA) |

* * * * * * * * * * * * * * * * * * * * *

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
(A) AUTHORIZING USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363; (B) GRANTING ADEQUATE
PROTECTION PURSUANT TO 11 U.S.C. § 363; AND (C) SCHEDULING
<u>A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001</u>**

Gourmet Express Acquisition Fund, LLC ("<u>GEAF</u>"), Gourmet Express Holdings, LLC ("<u>Holdings</u>") and Gourmet Express, LLC ("<u>Gourmet Express</u>", and together with GEAF and Holdings, the "<u>Debtors</u>"), hereby file this motion (the "<u>Motion</u>") seeking, on an emergency basis,

entry of an order, pursuant to 11 U.S.C. §§ 363(b)(1), 363(c), and 363(e), and Federal Rule of Bankruptcy Procedure 4001: (i) authorizing use of cash collateral; (ii) granting adequate protection; and (iii) scheduling a final hearing.  In support of this Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent:

## Preliminary Statement

1. In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital needs, liquidity needs, payroll obligations, and other routine payables.  All of the Debtors' cash and cash proceeds are subject to the asserted security interests in favor of the Prepetition Secured Creditors (as defined below) and, as such, constitute "cash collateral" of the Prepetition Secured Creditors (as such term is defined in Bankruptcy Code section 363(a), "Cash Collateral").  The Debtors have an immediate and urgent need to use their Cash Collateral.  Absent the use of Cash Collateral, the Debtors will not be able to meet their working capital and liquidity needs and payroll obligations, and their estates and creditors will suffer immediate and irreparable harm.

## Jurisdiction and Venue

2. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of these cases and the within motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rule 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Relief Requested

3. By this Motion, pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy

Code, as supplemented by Bankruptcy Rules 2002, 4001 and 9014, the Debtors request entry of an interim Order (the "Interim Order") authorizing:

  A. in the case of the Interim Order, the Debtors' use of Cash Collateral in amounts necessary to make payments provided for under the budget attached hereto as **Exhibit A** (the "Budget") for the period from the entry of the Interim Order through and including the date of the Final Hearing (as defined below);

  B. the Debtors to provide adequate protection as specified herein in favor of the Prepetition Secured Creditors (as defined below) to secure the diminution in the value of the liens of the Prepetition Secured Creditors caused by the use of Cash Collateral on all pre- and postpetition property of the Debtors' estates and all proceeds thereof (but not including Avoidance Actions[1] and the proceeds thereof), subject and/or junior to the (i) payment of the Carve Out Expenses and (ii) the existing liens;

  C. authorizing the Debtors to draw Cash Collateral pursuant to the Interim Order and in accordance with the Budget, from the Lockbox Account (as defined below), and directing Siena (as defined below) to use its best efforts to facilitate the timely transfer of Cash Collateral necessary to make payments in accordance with the Budget;

  D. relief from the automatic stay necessary to perfect liens granted under the Interim Order and a final order (the "Final Order");

  E. pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before the Court to consider entry of the Interim Order; and

  F. the scheduling of a final hearing (the "Final Hearing") to consider entry of the Final Order.

## Background

A. The Chapter 11 Cases

  4. On March 16, 2015 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors intend to continue in

---

[1] Terms not defined herein shall have the meanings ascribed to them in the Interim Order.

-3-

the possession of their property and the management of their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. No creditors committee has yet been appointed in these cases by the United States Trustee.

B. <u>Background of Debtors and Their Business Operations</u>

6. Gourmet Express is the manufacturer of frozen skillet meals sold under the retail name "Gourmet Dining." It wholesales its frozen skillet meals to numerous retailers throughout the United States, including WalMart, Costco and Aldi's. Gourmet Express manufactures its products at a 332,465 square foot facility (the "<u>Facility</u>") located in Greenville, Kentucky. A portion of Gourmet Express' back office operations are located in McAllen, Texas.

7. Gourmet Express was incorporated in Texas on December 1, 1997 and previously filed bankruptcy under Chapter 11 of the Bankruptcy Code in the Western District of Texas in 2007. GEAF was incorporated in Maryland on September 28, 2007 for the purpose of purchasing the equity interests of Gourmet Express out of the prior bankruptcy. Subsequent to GEAF's acquisition of Gourmet Express, GEAF created Holdings, which was incorporated in Maryland on May 11, 2010. Holdings was created for the singular purpose of holding a trademark for a separate line of specialized skillet meals, which was discontinued in 2014. GEAF is the holding company that owns the equity interests of both Gourmet Express and Holdings.

8. Gourmet Express' revenues are derived solely from the sale of frozen skillet meals. The Company has one full time sales manager who manages a food broker network of twenty-four (24) food brokers. The food brokers have direct contact with the customers and

present the Company's product for sale to the respective customer buyers. It currently has approximately ninety-eight (98) employees on both a part-time and full-time basis.

C.  Existing Indebtedness and Events Leading to Bankruptcy Filing

9.  Gourmet Express has been suffering from a significant reduction in sales coupled with high overhead and significant non-operational costs. During 2014, Gourmet Express' revenues declined significantly, from approximately $61,000,000 in calendar year 2013 to $49,000,000 in 2014. A primary reason for the decrease in revenue is the reduction in sales to Walmart, Wakefern and Aldi's. Further reductions in sales to these customers are forecasted for 2015.

10. In addition to slumping sales, Gourmet Express' rent at its Kentucky facility is well above market for the area, and the facility has significantly more square footage than needed. Continuing operations at this location is not sustainable at the current rent level. The combination of high overhead costs and not generating sufficient gross profits to pay such high overhead costs has caused significant cash flow problems.

11. Non-operational obligations are also causing a significant drain on Gourmet Express' cash flow, including settlements and a judgment from various lawsuits. These settlements and judgment not only have a negative impact on Gourmet Express' cash flow and balance sheet, they have significantly hurt Gourmet Express' ability to seek the proper level of financing necessary to sustain operations.

12. Gourmet Express currently funds its operations through a revolving facility with Siena Lending Group, LLC ("Siena"). Siena controls all accounts receivable of Gourmet Express' operations, and lends to fund payroll and operation costs based on receivables and the funding needs of Gourmet Express. Gourmet Express is burdened by significant debt of over $37,000,000, including prepetition secured debt to Siena in the approximate amount of $1,400,000, and has

incurred net losses over the last four years cumulating to over $23,000,000. Secured debt to other secured creditors as of the Petition Date is in excess of $16,000,000. The Debtors' estimate their current assets at a value of approximately $3.5 to $8.5 million.

13. As a result of the deteriorating financial and operating conditions prior to the Petition Date, the Debtors engaged Traxi, LLC ("Traxi") to assess and advise on restructuring options. The Debtors ultimately determined that a sale of the Gourmet Express business as a going concern would yield the best result and be in the best interests of creditors and other parties in interest. The Debtors have also engaged Traxi to market and sell the assets of Gourmet Express. The Debtors have determined that a structured sale process with defined milestones under the protections of Chapter 11 (the "Sale Process") would be the quickest and most efficient way to effectuate a sale of substantially all of Gourmet Express' assets in a manner that will maximize proceeds to benefit creditors. The Debtors anticipate that they will be filing appropriate motions seeking approval of bidding procedures and ultimately the sale of Gourmet Express' assets under Section 363 of the Bankruptcy Code in the near term.[2]

D. The Prepetition Secured Creditors

14. Gourmet Express and Wells Fargo Bank, National Association ("Wells Fargo") were parties to that certain Credit and Security Agreement dated as of June 22, 2012, as amended (the "Wells Fargo Credit Agreement"). Wells Fargo issued a letter of credit under the Wells Fargo Credit Agreement on behalf of Gourmet Express in the amount of $80,000 for the benefit of the U.S. Customs Service (the "Wells Fargo LOC"). Gourmet Express deposited the amount of $128,000 in an account held by Wells Fargo to secure Gourmet Express's obligations under

---

[2] The Debtors are currently awaiting a draft asset purchase agreement from a potential stalking horse bidder.

the Wells Fargo LOC (the "WF Deposit"). As of the Petition Date, the Wells Fargo LOC is outstanding and fully secured by the WF Deposit.

15. Pursuant to a certain Non-Recourse Assignment and Acceptance Agreement, dated as of December 3, 2014, Siena purchased all of Wells Fargo's right, title and interest in the Wells Fargo Credit Agreement and related loan documents. Pursuant to that certain Amended and Restated Loan and Security Agreement (the "Existing Revolving Loan Financing Agreements") by and among Gourmet Express as borrower, GEAF and Holdings as guarantors, and Siena as lender, dated as of December 3, 2014, Siena provided Gourmet Express with a revolving credit facility (and provided certain letters of credit). As of the Petition Date, the outstanding principal amount due under the Existing Revolving Loan Financing Agreement is approximately $1,400,000. To secure obligations of Gourmet Express, GEAF and Holdings (collectively, the "Debtor Obligors") under the Existing Revolving Loan Financing Agreement, the Debtor Obligors granted Siena a security interest in substantially all of the Debtor Obligors' prepetition assets ("Siena's Prepetition Collateral"). Additionally, pursuant to their agreement with Siena, funds of the Debtor Obligors are deposited into a lockbox account (the "Lockbox Account"), from which the Debtors may only draw funds with the permission of Siena.

16. Pursuant to that certain Term Loan and Security Agreement by and among Frozen Foods LLC ("Frozen Foods") as lender, Gourmet Express as borrower, GEAF and Holdings as guarantors, dated as of March 6, 2015, Frozen Foods loaned Gourmet Express the sum of $300,000 (the "Existing Frozen Foods Term Loan Financing Agreement"). As of the Petition Date, the outstanding principal amount due under the Existing Frozen Foods Term Loan Financing Agreement is approximately $300,000. To secure obligations of the Debtor Obligors under the Existing Frozen Foods Term Loan Financing Agreement, the Debtor Obligors granted

Frozen Foods a security interest in substantially all of their pre-petition assets (the "Frozen Foods Collateral").

17. Pursuant to that certain Amended and Restated Term Loan and Security Agreement by and among Gourmet Express as borrower, GEAF and Holdings as guarantors and Genesis Merchant Partners, LP ("GMP") and Genesis Merchant Partners II, LP ("GMP II", and collectively with GMP, "Genesis") as lenders, dated as of June 22, 2012 (as amended by Amendments Nos. 1-4)(the "Genesis Term Loan A") and that certain Term Loan B and Security Agreement by and among Gourmet Express as borrower, GEAF and Holdings as guarantors and Genesis as lender dated as of August 22, 2013 (the "Genesis Term Loan B"), the Term Loan Lenders made secured term loans to Gourmet Express in the aggregate original principal amount of $10,799,743.90. The Genesis Term A Loan and the Genesis Term B Loan (collectively, the "Genesis Term Loans") are evidenced by that certain Fifth Amended and Restated Term Loan A Note I in the original principal amount of $8,243,782, the Fourth Amended and Restated Term Loan A Note II in the original principal amount of $755,961.90, and the Term Loan B Note in the original principal amount of $1,500,000. As of the Petition Date, the outstanding amount due under the Genesis Term Loans, Fifth Amended and Restated Term Loan A Note I, Fourth Amended and Restated Term Loan A Note II and the Term Loan B Note (collectively the "Genesis Term Loan Documents") is approximately $15,297,044. To secure obligations of the Debtor Obligors under the Genesis Term Loan Documents, the Debtor Obligors granted Genesis a security interest in substantially all of their pre-petition assets (the "Genesis Prepetition Collateral", and collectively with Siena's Prepetition Collateral and the Frozen Foods Prepetition Collateral, the "Prepetition Collateral").

18. Siena, Frozen Foods and Genesis (collectively the "Prepetition Secured Parties") are party to that certain Intercreditor and Subordination Agreement dated as of June 22, 2012, as amended by that certain First Amendment to Intercreditor Agreement dated as of September 28, 2012, and that certain Second Amendment to Intercreditor Agreement effective as of August 22, 2013 (the "Intercreditor Agreement"). Pursuant to the Intercreditor Agreement: (i) the obligations of Debtor Obligors to Siena under the Existing Revolving Loan Financing Agreements are secured on a first priority basis by the Prepetition Collateral; (ii) the obligations of Debtors to Frozen Foods under the Existing Frozen Foods Term Loan Financing Agreement are secured on a second priority basis by the Prepetition Collateral; and (iii) the obligations of Debtors to Genesis under the Genesis Term Loan Documents are secured on a third priority basis by the Prepetition Collateral.[3]

### The Debtors' Urgent Need for Use of Cash Collateral

19. The Debtors have an emergency need for the immediate use of Cash Collateral to, among other things, maintain ongoing day-to-day operations. In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital and liquidity needs. In addition the Debtors require the use of cash on hand to fund these chapter 11 cases in order to complete the Sale Process and successfully emerge from chapter 11. The use of Cash Collateral is necessary for the Debtors to preserve sufficient liquidity to maintain day-to-day operations and fund their working capital needs. Absent the immediate and ongoing use of Cash Collateral, the Debtors will suffer immediate and irreparable harm and be

---

[3] Although Wells Fargo is a secured creditor, it does not have a security interest in the Prepetition Collateral, but instead is secured by the WF Deposit. Accordingly, Wells Fargo is not included as a "Prepetition Secured Party" for the purposes of this Motion and the Debtors do not seek to use cash in the WF Deposit.

forced to cease operations thereby impairing their ability to maximize the value of the Debtors assets, pay employees and reorganize.

20. The Prepetition Secured Creditors will assert that their claims against the Debtors are secured by enforceable liens and security interests in substantially all of the Prepetition Collateral. All cash and cash equivalents in which Debtors have an ownership interest, and in which the Secured Creditors claim an interest (i.e., the Cash Collateral), constitute cash collateral within the meaning of Section 363 of the Bankruptcy Code, 11 U.S.C. § 363(a).

21. The Debtors seek authority, during the period between the Petition Date to and including the date of the Final Hearing (the "Interim Cash Collateral Period"), to use Cash Collateral in accordance with the Budget.

## Authority to Use Cash Collateral and Provide Adequate Protection

22. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the Debtors have the consent of the Prepetition Secured Creditors.

23. Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property… to be used, sold or leased, by the trustee, the court ... shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Although the Bankruptcy Code does not define "adequate protection," section 361 of the Bankruptcy Code sets forth a non-exclusive list of examples as to how adequate protection may be provided, including cash payments and replacement liens. *See Siemens Med. Solutions USA, Inc. v. Greenbelt CT Imaging Ctr., LLC (In re Greenbelt CT*

*Imaging Ctr., LLC)*, No. 07-18958, 2008 WL 2705527, *1-2 (Bankr. D. Md. July 2, 2008) (Mannes, J.); *see also In re Washington*, No. 14-05589, 2015 WL 890981, *3 (Bankr. D.S.C. Feb. 26, 2015). The determination of what constitutes adequate protection is made on a case-by-case basis. *See In re JKJ Chevrolet, Inc.*, 190 B.R. 542, 545 (Bankr. E.D. Va. 1995). The purpose of adequate protection is to preserve a secured creditor's position and to protect the secured creditor from diminution of the value of its interest in collateral during the bankruptcy process. *See In re SunTrust Bank v. Den-Mark Constr., Inc. (In re Den-Mark Constr., Inc.)*, 406 B.R. 683, 702 (E.D.N.C. 2009).

24. In order to protect the Prepetition Secured Creditors from any diminution in value of their interests in the Cash Collateral during the pendency of the Debtors' Cases, the Debtors have agreed to provide to the Prepetition Secured Creditors adequate protection. The proposed adequate protection for Siena, Frozen Foods and Genesis includes postpetition liens on substantially all the Debtors' assets and in the same priority as agreed upon by the Prepetition Secured Creditors in the Intercreditor Agreement, as set forth in the proposed Interim Order. As further adequate protection for the use of Cash Collateral, Siena and Frozen Foods (but not Genesis) will be provided superpriority claims as set forth in the proposed Interim Order.

25. The proposed adequate protection is justified and sufficient to protect the Prepetition Secured Creditors from any diminution in the value of their Prepetition Collateral resulting from the use of the Cash Collateral, the Carve Out Expenses, and the imposition of the automatic stay. The proposed adequate protection will sufficiently protect the Prepetition Secured Creditors' interests in the Prepetition Collateral.

26. Frozen Foods and Genesis are consenting to the Debtors' use of Cash Collateral during the Interim Cash Collateral Period with the adequate protection proposed for by the Debtor herein.

27. Siena has not yet consented to the Debtors' use of Cash Collateral. However, because of Siena's first priority position under the Intercreditor Agreement and otherwise, its adequate protection offered by Debtors herein is more than sufficient to adequately protect Siena's interest in the Prepetition Collateral. Siena's liens in the approximate amount of $1.4 million have a priority position ahead of Frozen Foods' and Genesis' secured claims of approximately $16 million and benefit from an equity cushion of between $2.1 million and $7 million.

28. The Debtors submit that the terms of the use of Cash Collateral and the proposed adequate protection as set forth in the Interim Order are sufficient to protect any diminution in the value of the Prepetition Secured Parties' interest in the Debtors' assets and the Cash Collateral, and are fair and reasonable under the circumstances. Accordingly, the Court should approve the Debtors' use of the Cash Collateral pursuant to the terms set forth in the Interim Order.

### **Interim Relief Should be Granted**

29. Bankruptcy Rule 4001(b) provides that a final hearing on a motion for authorization to use cash collateral may not be commenced earlier than 14 days after service of the motion. Upon request, however, the Court may conduct a preliminary expedited hearing before such 14-day period expires and may authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

30. Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct

an expedited preliminary hearing on this motion to (a) authorize the use of the Prepetition Secured Parties' Cash Collateral, including, but not limited to, authorizing the Debtors to draw cash collateral from the Lockbox Account and/or directing Siena to use its best efforts to facilitate the timely transfer of Debtors' funds from the Lockbox Account to Debtors sufficient to make payments set forth in the Budget; (b) grant the Prepetition Secured Parties adequate protection for any diminution in the value of their respective interests in the Prepetition Collateral; (c) vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order; and (d) schedule a Final Hearing.

## No Prior Request

31. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

## Notice with Respect to Interim Hearing

32. In light of the Debtors' immediate need to use Cash Collateral to avoid immediate and irreparable harm to the Debtors and their estates, the Debtors will provide actual notice of their request for approval of Cash Collateral by written notice by telecopy, electronic mail, and/or hand-delivery to (a) the United States Trustee, (b) the Debtors' twenty largest unsecured creditors on a consolidated basis, (c) counsel to the Prepetition Secured Creditors, and (d) the Internal Revenue Service. The Debtors submit that under the circumstances, no further notice of hearing on interim use of Cash Collateral is necessary, and request that the Court consider such notice of the interim hearing to be sufficient notice under Bankruptcy Rule 4001.

33. The Debtors respectfully request that they be authorized to serve a copy of the Interim Order, once entered by the Court, which will fix the time and date for filing of Objections, if any, by first class mail upon (a) the Debtors' 20 largest unsecured creditors on a

consolidated basis; (b) the Prepetition Secured Creditors; (c) the Office of the United States Trustee; (d) the Internal Revenue Service and all applicable state and local taxing authorities; and (e) all parties in interest and counsel having filed written requests for notice in these cases. Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

**WHEREFORE,** the Debtors respectfully request that this Court (i) enter the form of Interim Order submitted with this Motion or otherwise enter an order authorizing the Debtors to use Cash Collateral pursuant to the Budget, (ii) schedule a Final Hearing on the Motion, (iii) after notice and an opportunity for a hearing, enter an Order authorizing the Debtors to use Cash Collateral on a final basis, and (iv) grant such further relief as is appropriate.

Dated:  March 16, 2015					WHITEFORD TAYLOR & PRESTON LLP

/s/ *Dennis J. Shaffer*
Paul M. Nussbaum (Bar No. 04394)
John F. Carlton (Bar No. 06591)
Dennis J. Shaffer (Bar No. 25680)
Seven Saint Paul Street, 15th Floor
Baltimore, Maryland 21202-1636
(410) 347-8700
pnussbaum@wtplaw.com
jcarlton@wtplaw.com
dshaffer@wtplaw.com
*Proposed Counsel for the Debtors*

**CERTIFICATE OF SERVICE**

      I certify that a copy of the foregoing was served in the manner and on the date indicated, and to the parties identified, in the *Omnibus Certificate of Service* related hereto. In order to expedite the copying and transmittal of papers filed to parties in interest, a copy of the *Omnibus Certificate of Service* has not been transmitted with the foregoing. Any party seeking a copy of the *Omnibus Certificate of Service* may contact the undersigned or may review the *Omnibus Certificate of Service* via PACER.

      /s/ *Alan C. Lazerow*
      Alan C. Lazerow

*2132176*