**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | | |
|---|---|---|
| In re: | * | |
| | | |
| **GOURMET EXPRESS ACQUISITION** | * | Case Nos: 15-13670(NVA), 15-13673(NVA), |
| **FUND, LLC,** *et al.*, | | and 15-13674(NVA) |
| | * | |
| Debtors. | | **Chapter 11** |
| | * | |
| | | **Jointly Administered under** |
| | * | **Case No: 15-13670 (NVA)** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEBTORS' MOTION FOR ORDERS: (I) APPROVING SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS TO GENESIS MERCHANT PARTNERS, LP
AND GENESIS MERCHANT PARTNERS II, LP, OR SUCH OTHER WINNING
BIDDER, FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES;
(II) APPROVING BIDDING PROCEDURES AND BREAK-UP FEE IN CONNECTION
WITH SUCH SALE; (III) APPROVING ASSUMPTION, ASSIGNMENT AND SALE
OF CERTAIN EXECUTORY CONTRACTS AND RELATED PROCEDURES;
(IV) SCHEDULING HEARINGS AND PRESCRIBING FORM AND
MANNER OF NOTICE; AND (V) GRANTING RELATED RELIEF**

Gourmet Express Acquisition Fund, LLC ("GEAF"), Gourmet Express Holdings, LLC

("Holdings") and Gourmet Express, LLC ("Gourmet Express", and together with GEAF and

Holdings, the "Debtors"), by and through their undersigned counsel, hereby file this motion (the

"Motion") seeking entry of orders pursuant to sections 105, 363 and 365 of title 11 of the United

States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1

of the Local Rules for the United States Bankruptcy Court for the District of Maryland (the

"Local Rules"): (i) approving the sale of substantially all assets of the Debtors to Genesis

Merchant Partners, LP ("GMP") and Genesis Merchant Partners II, LP ("GMP II," and together

with GMP, "Genesis"), or such other winning bidder, free and clear of all liens, claims, interests

and encumbrances; (ii) approving bidding procedures and a break-up fee in connection with such sale; (iii) approving the assumption and assignment of certain executory contracts, and related procedures; (iv) scheduling hearings and prescribing the form and manner of notice; and (v) granting related relief.   In support of this Motion, the Debtors respectfully represent as follows:

**Introduction**

1.        Subject to approval of the Court, Gourmet Express, GEAF and Holdings (collectively, the "Sellers") and Genesis (the "Stalking Horse Bidder") have entered into a stalking horse asset purchase agreement (the "Asset Purchase Agreement"), pursuant to which the Stalking Horse Bidder has agreed to purchase substantially all of the assets of the Debtors (the "Assets" including, without limitation, that portion of the Assets defined as the "Purchased Assets" in the Asset Purchase Agreement) for approximately $10,800,000 plus the assumption of certain Assumed Liabilities[1] as set forth in the Asset Purchase Agreement.  A copy of the Asset Purchase Agreement is annexed hereto as Exhibit A.

2.        As more fully set forth below, the Debtors seek entry of two orders: (i) an order, substantially in the form annexed hereto as Exhibit B (the "Sale Procedures Order"), establishing certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Assets of the Debtors free and clear of any and all liens, claims, and encumbrances, approving the payment of a break-up fee in connection with such sale, approving the form and manner of the sale notice and the procedures for the assumption and assignment of executory contracts and unexpired leases in connection with such sale, and setting a hearing on the sale (the "Sale Hearing"); and (ii) an order, substantially in the form annexed hereto as Exhibit C (the "Sale Order"), authorizing and approving the sale (the "Sale") of the Assets to the Stalking Horse

---

[1] Capitalized terms not otherwise defined herein have the same meanings given them in the Asset Purchase Agreement.

Bidder, or the right to consummate a higher or otherwise better alternative disposition of assets with an alternative buyer pursuant to the terms of the Sale Procedures Order.

## Jurisdiction and Venue

3.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.    Venue of these proceedings and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

5.    The statutory predicates for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code.

## The Chapter 11 Cases

6.    On March 16, 2015 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Cases").  The Debtors intend to continue in the possession of their property and the management of their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7.    On March 26, 2015, an official committee of unsecured creditors (the "Creditors' Committee") was appointed in these Cases by the United States Trustee.

## Background of Debtors and Their Business Operations

8.    Gourmet Express is the manufacturer of frozen skillet meals sold under the retail name "Gourmet Dining."  It wholesales its frozen skillet meals to numerous retailers throughout the United States, including WalMart, Costco and Aldi's.  Gourmet Express manufactures its products at a 332,465 square foot facility located in Greenville, Kentucky.  A portion of Gourmet Express' back office operations are located in McAllen, Texas.

9.     Gourmet Express was formed under the laws of Texas on December 1, 1997 and previously filed bankruptcy under Chapter 11 of the Bankruptcy Code in the Western District of Texas in 2007.  GEAF was incorporated in Maryland on September 28, 2007 for the purpose of purchasing the equity interests of Gourmet Express out of the prior bankruptcy.  Subsequent to GEAF's acquisition of Gourmet Express, GEAF created Holdings, which was incorporated in Maryland on May 11, 2010.  Holdings was created for the singular purpose of holding a trademark for a separate line of specialized skillet meals, which was discontinued in 2014. GEAF is the holding company that owns the equity interests of both Gourmet Express and Holdings.

10.     Gourmet Express' revenues are derived solely from the sale of frozen skillet meals.  The Company has one full time sales manager who manages a food broker network of twenty-four (24) food brokers.   The food brokers have direct contact with the customers and present the Company's product for sale to the respective customer buyers.  As of the Petition Date, Gourmet Express had approximately ninety-eight (98) employees on both a part-time and full-time basis.[2]

**Existing Indebtedness and Events Leading to Bankruptcy Filing**

11.     Gourmet Express has been suffering from a significant reduction in sales coupled with high overhead and significant non-operational costs.  During 2014, Gourmet Express' revenues declined significantly, from approximately $61,000,000 in calendar year 2013 to $49,000,000 in 2014.  A primary reason for the decrease in revenue is the reduction in sales to Walmart, Wakefern and Aldi's.  Further reductions in sales to these customers are forecasted for 2015.

12.     In addition to slumping sales, Gourmet Express' rent at its Kentucky facility is well above market for the area, and the facility has significantly more square footage than needed.

---

[2]     Nine (9) of the employees are salaried, and the remaining eighty-nine (89) are hourly.

Continuing operations at this location is not sustainable at the current rent level. The combination of high overhead costs and not generating sufficient gross profits to pay such high overhead costs has caused significant cash flow problems.

13.     Non-operational obligations are also causing a significant drain on Gourmet Express' cash flow, including settlements and a judgment from various lawsuits. These settlements and judgment not only have a negative impact on Gourmet Express' cash flow and balance sheet, they have significantly hurt Gourmet Express' ability to seek the proper level of financing necessary to sustain operations.

14.     Prior to the Petition Date, Gourmet Express funded its operations through a revolving facility with Siena Lending Group, LLC ("Siena" or the "First Lien Lender"). Under the revolver, Siena controlled all accounts receivable of Gourmet Express' operations and loaned amounts to fund payroll and operation costs based on receivables and the funding needs of Gourmet Express. Gourmet Express is burdened by significant debt of over $37,000,000 and has incurred net losses over the last four years cumulating to over $23,000,000.

15.     As a result of the deteriorating financial and operating conditions prior to the Petition Date, the Debtors engaged Traxi, LLC ("Traxi") to assess and advise on restructuring options. The Debtors ultimately determined that a structured sale process with defined milestones under the protections of Chapter 11 (the "Sale Process") would be the quickest and most efficient way to effectuate a sale of substantially all of Gourmet Express' assets in a manner that will maximize proceeds to benefit creditors.

### The Prepetition Secured Parties

16.     Pursuant to that certain Amended and Restated Loan and Security Agreement (the "Revolving Loan Financing Agreement") by and among Gourmet Express as borrower, GEAF and Holdings as guarantors, and Siena as lender, dated as of December 3, 2014, Siena provided

Gourmet Express with a revolving credit facility and provided certain letters of credit. As of the Petition Date, the outstanding principal amount due under the Revolving Loan Financing Agreement was approximately $1,500,000. To secure obligations of Gourmet Express, GEAF and Holdings (collectively, the "Debtor Obligors") under the Revolving Loan Financing Agreement, the Debtor Obligors granted Siena a security interest in substantially all of the Debtor Obligors' prepetition assets ( the "Siena Prepetition Collateral").

17.     Pursuant to that certain Term Loan and Security Agreement (the "Second Lien Credit Agreement") by and among Frozen Foods LLC ("Frozen Foods" or the "Second Lien Lender") as lender, Gourmet Express as borrower, GEAF and Holdings as guarantors, dated as of March 6, 2015, Frozen Foods loaned Gourmet Express the sum of $300,000. As of the Petition Date, the outstanding principal amount due under Second Lien Credit Agreement was approximately $300,000. To secure obligations of the Debtor Obligors under the Second Lien Credit Agreement, the Debtor Obligors granted Frozen Foods a security interest in substantially all of their prepetition assets (the "Frozen Foods Collateral").

18.     Pursuant to that certain Amended and Restated Term Loan and Security Agreement by and among Gourmet Express as borrower, GEAF and Holdings as guarantors and Genesis as lenders, dated as of June 22, 2012 (as amended by Amendments Nos. 1-4)(the "Genesis Term Loan A") and that certain Term Loan B and Security Agreement by and among Gourmet Express as borrower, GEAF and Holdings as guarantors and Genesis as lender dated as of August 22, 2013 (the "Genesis Term Loan B"), Genesis made secured term loans to Gourmet Express in the aggregate original principal amount of $10,799,743.90. The Genesis Term Loan A and the Genesis Term Loan B are collectively, the "Genesis Term Loans". As of the Petition Date, the outstanding amount due under the Genesis Term Loans was $15,682,655. To secure

6

obligations of the Debtor Obligors under the Genesis Term Loans (the "Third Lien Obligations"), the Debtor Obligors granted Genesis a security interest in substantially all of their prepetition assets. (the "Genesis Collateral").

19.      Prior to the commencement of the Cases, Siena, in its capacity as the pre-petition revolving lender under the Revolving Loan Financing Agreement entered into a certain Intercreditor and Subordination Agreement, dated June 22, 2013, as amended, with Genesis (the "Intercreditor Agreement"). In connection with the post-petition financing provided by Siena to the Debtors, the Intercreditor Agreement was amended to, among other things, add Frozen Foods as a party thereto. The Intercreditor Agreement concerns certain rights, obligations and priorities of the liens and security interests of Siena and Genesis, with respect to, among other things, the Revolving Loan Collateral, the Frozen Foods Collateral and the Genesis Collateral.

### The DIP Financing

20.      On March 30, 2015, the Debtors, filed their *Amended Motion for Entry of Interim and Final Financing Orders (a) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (b) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (c) Authorizing Debtors to Enter into an Agreement with Siena Lending Group, LLC; (d) Authorizing the Use of Cash Collateral; and (e) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "DIP Motion"). Pursuant to the DIP Motion, the Debtors sought authority to enter into a Ratification and Amendment Agreement with Siena (the "Siena Ratification Agreement") ratifying and amending the Revolving Loan Financing Agreement (as amended by the Siena Ratification Agreement the "First Lien Credit Agreement") to permit Siena to resume making revolving loans to Gourmet Express post-petition (the "DIP Financing"). On April 1, 2015, the Court entered an Order approving the DIP Financing on an

interim basis.

## Marketing of the Assets

21.     Commencing on the Petition Date, the Debtors, with the assistance of Traxi, began marketing of the Debtors' assets for sale as a going concern and soliciting suitable potential buyers.  Traxi compiled a list of strategic or financial entities that might be likely to purchase the Assets.  Traxi also researched public and privately-held companies in the same and similar industries as the Debtors and reviewed its own proprietary databases of potential financial buyers interested in investing in companies in similar industries and/or situations as the Debtors.  Traxi then reviewed the data and focused the list to target those companies with the financial wherewithal and/or most compelling strategic rationales to pursue a transaction with the Debtors.

22.     The Debtors and Traxi contacted numerous strategic and financial buyers, reviewed the qualifications and merits of those buyers and, where appropriate, facilitated discussions.  Traxi contacted approximately 59 potential buyers in connection with a Sale of the Assets.  Approximately fifteen (15) of those parties received confidential information and Data Room access detailing the operations and finances of the Debtors.  More than twenty potential buyers engaged in discussions with Traxi and/or the Debtor's CRO regarding the general parameters of the Sale of the Assets.  Traxi followed up with all interested buyers, provided due diligence information and access to the established Data Room, answered questions about the Debtors and the Sale process.

23.     The Debtors have determined that the proposal they received from the Stalking Horse Bidder was the best offer to purchase the Assets to date.  Accordingly, with the stalking horse bidding floor and Asset Purchase Agreement in place, the Debtors now seek to implement a competitive bidding process and effectuate a sale promptly to the Stalking Horse Bidder, or

such other Winning Bidder, subject to Court approval.

**The Asset Purchase Agreement with the Stalking Horse Bidder**

24.     The Debtors concluded that the offer received from the Stalking Horse Bidder represented the highest and best offer for the Assets received to date from interested parties.  As a result, the Debtors, in their business judgment, determined that it was in the best interests of the Debtors and their estates to lock in and finalize Stalking Horse Bidder's proposal as a "stalking horse" binding offer and to initiate a process to solicit competing bids and conduct an auction. Thus, after arm's length negotiations, the Debtors and the Stalking Horse Bidder entered into the Asset Purchase Agreement.  The Stalking Horse Bidder's offer is fair and reasonable, and in the Debtors' business judgment, is the best offer currently available for the Assets.  The Asset Purchase Agreement provides for the sale of substantially all of the assets of the Debtors, as well as the assignment of certain executory contracts related to the operation of the Debtors' businesses.

25.     The more salient terms of the Asset Purchase Agreement are as follows:[3]

        a.      Buyer.  The Stalking Horse Bidder

        b.      Sellers. Gourmet Express, GEAF and Holdings

        c.      Purchased Assets.  Purchased Assets include, but are not limited to, Accounts Receivable[4] of Sellers, cash, cash equivalents, bank deposits and similar cash items of Sellers, Cash Payments, Inventory, deposits and other prepaid charges and expenses of Sellers, rights of Sellers to any Real Property owned by Sellers and under each Real Property Lease, Furniture and Equipment, Purchased Intellectual Property and Purchased Contracts and other assets, but not including the Excluded Assets, all as more fully set forth in section 2.1 of the Asset Purchase Agreement.

---

[3] The following is only a summary of the more salient terms and conditions of the Asset Purchase Agreement.  In the event of any inconsistency between the summary and the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement shall control.  Interested parties should review the Asset Purchase Agreement for a complete and accurate understanding of its terms and conditions.

[4] All terms not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

9

d.    <u>Excluded Assets</u>.  The Purchased Assets do not include, among other things, all Excluded Contracts, all Liabilities and other obligations, including note Indebtedness, certain Intellectual Property and other books and records of the Sellers, all as more fully set forth in <u>section 2.2 of the Asset Purchase Agreement</u>

e.    <u>Purchase Price</u>. The Purchase Price for the Purchased Assets is comprised of: (i) the Cash Payment in the amount equal to the outstanding obligations under the First Lien Credit Agreement; (ii) assumption of the Assumed Liabilities including the liabilities under the Second Lien Credit Agreement; and (iii) $9,000,000 in the form of a credit bid against the Third Lien Obligations owed to the Stalking Horse Bidder, all as more fully set forth in <u>section 3.1 of the Asset Purchase Agreement</u>.

f.    Assumed Liabilities.  The Stalking Horse Bidder will assume from the Sellers, and pay when due, perform and discharge all of the Assumed Liabilities set forth in section 2.4 of the Asset Purchase Agreement.

g.    <u>Bid Protections</u>.  The Asset Purchase Agreement provides for the payment of a break-up fee (the "<u>Break-Up Fee</u>") in an amount equal to $325,000 to the Stalking Horse Bidder.

h.    <u>Expense Reimbursement</u>.  The Asset Purchase Agreement provides for the reimbursement of the Stalking Horse Bidder's reasonable transaction expenses, up to $125,000, in the event the Sellers terminate the Asset Purchase Agreement for any reason other than the Stalking Horse Bidder being in breach, including the sale of the Purchased Assets to a third party in a 363 Sale (the "<u>Expense Reimbursement</u>").

i.    <u>Subject to Bankruptcy Court Approval</u>.  The Debtors are required to obtain entry of the Sale Order no later than May 29, 2015.

## <u>RELIEF REQUESTED</u>

26.    By this Motion, the Debtors seek entry of (i) the Sale Procedures Order and the establishment of certain customary bidding procedures (the "<u>Bidding Procedures</u>") and protections (including the payment of the Break-Up Fee and Expense Reimbursement to the Stalking Horse Bidder under certain specified circumstances) in connection with the solicitation of higher or otherwise better bids for the Assets, all in accordance with the Sale Procedures Order, and (ii) the Sale Order and authorization to sell the Assets (free and clear of liens, claims and encumbrances) to the Stalking Horse Bidder pursuant to the terms of the Asset Purchase

Agreement, or to consummate an Alternative Transaction for the sale of the Assets to a party other than the Stalking Horse Bidder.

A.    The Bidding Procedures

27.    Under the Asset Purchase Agreement, the Debtors have agreed to the Bidding Procedures, which not only afford the Stalking Horse Bidder some measure of protection for its "stalking horse" bid but which also benefit the Debtors by, among other things, creating a competitive bidding process that ensures: (i) the Debtors' ability to compare the relative values of competing offers, if any, (ii) that a potential alternative buyer has the financial wherewithal to consummate its purchase, and (iii) meaningful bidding increments.   The Debtors believe the proposed Bidding Procedures will enable the Debtors to sell the Assets for the greatest value and maximize recovery for the benefit of the Debtors' estates and creditors.   Accordingly, the Debtors seek approval of the following Bidding Procedures.

28.    The following summary highlights the material terms of the Bidding Procedures and all parties in interest are referred to the Bidding Procedures which are set forth in the Sale Procedures Order, attached hereto as Exhibit B, for additional information regarding the proposed procedures:[5]

        a.    The Debtors, in consultation with their professionals, shall contact parties the Debtors reasonably believe may potentially be willing, qualified and financially able to consummate a Sale Transaction.  The Debtors may distribute an information package to any such parties with materials the Debtors deem appropriate under the circumstances including, but not limited to, preliminary "teaser" information.  Upon execution of a non-disclosure agreement in favor of the Debtors by any person identified by the Debtors, with the assistance of their financial advisors, as reasonably likely to be a Qualified Bidder (as defined below) that wishes to conduct due diligence on the Debtors or their assets with respect to a potential bid may be granted access to due diligence information.

---

[5] Parties interested in participating in the bidding process should review the terms and conditions set forth in the Sale Procedures Order, which will govern the bidding process.  In the event of any conflict between this Motion and the Sale Procedures Order, the provisions of the Sale Procedures Order shall control.

b.      Any prospective bidder, other than the Stalking Horse Bidder if selected (each a "Potential Bidder"), that wishes to participate in the bidding process for the Debtors' assets must, no later than May 18, 2015 at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline"):

i.      Submit to (i) the Debtors, (ii) the Creditors Committee, (iii) the Stalking Horse Bidder, (iv) the First Lien Lender and (v) the Second Lien Lender, through their respective counsel, an offer in the form of an executed asset purchase agreement (including all exhibits and schedules thereto) (the "Modified Agreement") without financing or due diligence contingencies (unless consented to by the First Lien Lender, the  Second Lien Lender and the Third Lien Lender, collectively the "Secured Lenders") at a price that conforms with the following paragraph b.ii (if the offer is for substantially all of the Debtors' assets), and on such other terms that are no less favorable to the Debtors, taken as a whole, than those contained in the Asset Purchase Agreement.  Such bid must be irrevocable through the Sale Hearing, unless the bid is selected as the Winning Bid or the Back-Up Bid (as such terms are defined below) at the Sale Hearing, in which case the bid shall be irrevocable through the closing of the Sale Transaction.  The Potential Bidder shall also submit a "blacklined" or otherwise marked copy of the Modified Agreement reflecting the differences between the Modified Agreement and the Asset Purchase Agreement.

ii.      Agree in such Modified Agreement, if its bid is for substantially all of the Debtors' assets, to provide consideration in an amount equal to or greater than: (i) the Purchase Price (as defined in the Asset Purchase Agreement); (ii) the Assumed Liabilities (as defined in the Asset Purchase Agreement); (iii) the Break-Up Fee and the Expense Reimbursement; and (iv) $100,000.   Such Modified Agreement may not restructure or assume the First Lien Obligations without the consent of the First Lien Lender, or the Second Lien Obligations without the consent of the Second Lien Lender or the Third Lien Obligations without the consent of the Third Lien Lender (the Third Lien Lender, the First Lien Lender and the Second Lien Lender, collectively, the "Secured Lenders").

iii.      Make a good faith cash deposit in the form of a cashier's check or wire transfer, in an amount not less than 20% of the purchase price set forth in the Modified Agreement (the "Bid Deposit") into a segregated, interest bearing escrow account (the "Segregated Account") that shall be opened by the Debtors for this purpose.  The Bid Deposit shall immediately become non-refundable (subject to the next sentence) and credited toward the purchase consideration, if and when the transaction with the Potential Bidder approved by the Court (the "Winning Bid" and the "Winning Bidder") is consummated.  If a Potential Bidder's bid is not designated as a Qualified Bid (as defined below), or such bid is not approved as the Winning Bid or the Back-Up Bid at the Sale Hearing, the Bid Deposit of such bidder, plus accrued interest, if any, will be returned to such bidder within ten (10) business days after the conclusion of the Sale Hearing.

iv.    Provide written evidence reasonably satisfactory to the Debtors, the Committee, the First Lien Lender and the Second Lien Lender of (A) its financial ability to (i) fully and timely perform all obligations under the Modified Agreement if it is declared to be the Winning Bidder, and (ii) provide adequate assurance of future performance under all contracts and leases to be assigned to it, (B) its qualification to own the assets and operate the businesses that are the subject of the Modified Agreement in compliance with all federal, state and local laws, and (C) its corporate authority to enter into and consummate the Sale Transaction.

v.    Disclose any connections or agreements with the Debtors, the Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder (as defined below), and/or any officer, director or direct or indirect equity security holder of the Debtors.

vi.    Waive the right to assert or seek payment of any claim, including an administrative expense claims or substantial contribution claim under section 503 of the Bankruptcy Code, with respect to its bid or the marketing or auction process, in its capacity as a bidder.

c.    If a Potential Bidder delivers all of the materials, deposits, disclosures and waivers described in paragraph b, above, (including the Bid Deposit) by the Bid Deadline, the Debtors, in reasonable consultation with the Committee and the Secured Lenders, will determine whether (i) the Potential Bidder has demonstrated the financial ability to consummate the proposed purchase of the Debtors' assets, (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions and (iii) has otherwise satisfied all of the requirements described in paragraph 6, above.  If so, the Debtors shall designate the Potential Bidder as a "Qualified Bidder" and such bid as a "Qualified Bid," provided, that the Debtors' designation of a bid as a Qualified Bid shall not be deemed a determination that such bid is the highest and/or best bid for the Debtors' assets.   For the avoidance of doubt, any bid that does not provide for the payment of the following amounts in full in cash at closing shall not be deemed a Qualified Bid: (a) to the First Lien Lender, the amount of the Debtors' obligations under the First Lien Credit Agreement, (b) to the Second Lien Lender, the amount of the Debtors' obligations under the Second Lien Credit Agreement, (c) to the Stalking Horse Bidder, for the amount of the Debtors' obligations under the Third Lien Credit Agreement that are being credit bid pursuant to Section 363(k) of the Bankruptcy Code pursuant to the Stalking Horse Agreement, (d) any cash contemplated to be paid pursuant to the Stalking Horse Agreement, (e) the amount of the Break-Up Fee and the Expense Reimbursement, and (f) an additional $100,000.  The Debtors shall promptly notify the Stalking Horse Bidder and the Secured Lenders of the identity of all Qualified Bidders. Notwithstanding anything to the contrary contained herein, (y) the Stalking Horse Bidder shall be deemed to be a Qualified Bidder and the Stalking Horse Bid shall be deemed a Qualified Bid and (z) the First Lien Lender and the Second Lien Lender shall be deemed Qualified Bidders and any bids submitted by any of them shall be deemed Qualified Bids, as long as any such bid is submitted by not less than two (2) days before the Auction.

d.      If the Debtors receive more than one (1) Qualified Bid from a Qualified Bidder (including the Stalking Horse Bidder, if any) prior to the Bid Deadline, then the Debtors shall notify the Secured Lenders, the Stalking Horse Bidder (if any) and each other Qualified Bidder that the Debtors intend to conduct an auction (the "Auction"), subject to reasonable rules and regulations as may be established by the Debtors, consistent with the Sale Procedures Order and in reasonable consultation with the Committee, and the Secured Lenders.  The Auction to determine the Winning Bidder and the Back-Up Bidder for the Debtors' assets shall be held on May 20, 2015 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors, Whiteford, Taylor & Preston, 7 St. Paul Street, Suite 1900, Baltimore, Maryland, 21202.   Each bidder participating at the Auction will be required to confirm that (a) it has not engaged in any collusion with respect to the bidding or the sale, and (b) its Qualified Bid does not contain any financing or due diligence contingencies (unless consented to by the First Lien Lender and the Second Lien Lender).  The Auction will be conducted openly, will be transcribed, and the Committee, the Secured Lenders, any Qualified Bidders, and each of their respective advisors, will be permitted to attend.  The Debtors shall file a notice announcing the results of the Auction and the identity of the proposed Winning Bidder and the Back-Up Bidder on the Court's docket as soon as practicable after conclusion of the Auction.

e.      Only the Stalking Horse Bidder and other Qualified Bidders may bid at the Auction.  Copies of all Qualified Bids shall be provided to the Committee, the Secured Lenders, the Stalking Horse Bidder and each other Qualified Bidder by May 19, 2015 at 5:00 p.m. (prevailing Eastern Time).  At the commencement of the Auction, the Debtors shall identify the bid that they have determined (after consultation with the Secured Lenders and the Committee) to be the highest and/or best offer as of such time, and shall permit the Stalking Horse Bidder and other Qualified Bidders to submit higher and/or better bids.  Each subsequent bid must exceed the amount of the preceding bid by not less than $100,000 and shall not be modified in a manner that causes it no longer to be a Qualified Bid.  The First Lien Lender and the Second Lien Lender each reserve the right to make a credit bid (pursuant to section 363(k) of the Bankruptcy Code or other applicable law) at the Auction.  Notwithstanding anything to the contrary contained herein, any bid (including a credit bid) submitted by the First Lien Lender or the Second Lien Lender shall be deemed a Qualified Bid, as long as such bid is submitted not less than two (2) days before the Auction.

f.      The Debtors, subject to the terms of the Sale Procedures Order and the oversight and approval of the Court, and in reasonable consultation with the Committee and the Secured Lenders, shall supervise the bidding process and conduct the Auction in a manner consistent with the Bid Procedures to provide the Stalking Horse Bidder and other Qualified Bidders a full, fair and equal opportunity to participate in the Auction. The Debtors may conduct the Auction in the manner they determine will result in the highest, best, or otherwise financially superior offer for the Debtors' assets and may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Sale Procedures Order, if applicable, the Asset Purchase Agreement.  The Debtors reserve the right, in their reasonable business judgment, to

make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual bidders; allow individual bidders to consider how they wish to proceed; and give individual bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the individual bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments for such individual bidder's proposed transaction.  The Debtors, in consultation with their financial advisors, their counsel, the Secured Lenders, and the Committee, shall determine which Qualified Bid or combination of Qualified Bids is to be recommended to the Court for approval as the highest and/or best bid(s).  The Debtors shall request at the Sale Hearing that the Court authorize the Debtors to consummate the Sale Transaction to such proposed Winning Bidder.

g.    If the Debtors do not receive more than one (1) Qualified Bid (inclusive of the Stalking Horse Bidder), then no Auction shall be scheduled or conducted, and the Court at the Sale Hearing shall solely consider the approval of the Sale Transaction to the Stalking Horse Bidder; the Court shall not consider any competing or alternative offers or proposals to purchase the Debtors' assets subject to such Qualified Bid, nor shall the Court consider any objections to the Motion that are based on the existence or potential for other or different offers or proposals to purchase such assets.

h.    No bidder shall be entitled to any expense reimbursement or break-up fee of any kind with respect to its bid.

i.    The Bid Deposit of a Winning Bidder other than the Stalking Horse Bidder shall be forfeited if the Modified Agreement of such Winning Bidder is thereafter terminated by Seller as a result of a breach by the Winning Bidder of its obligations thereunder.  The Bid Deposit of the Back-Up Bidder (other than the Stalking Horse Bidder) shall remain on deposit in the Segregated Account pending the Closing Date (as defined below), and such deposit shall be forfeited if the Back-Up Bidder becomes the Winning Bidder and its Modified Agreement is thereafter terminated by Seller as a result of a breach by such Back-Up Bidder.  In either case, the forfeiture of the Bid Deposit shall be in addition to any other rights, claims and remedies that the Debtors and their bankruptcy estates may have against such Winning Bidder and/or Back-Up Bidder, as applicable (unless otherwise provided in such Winning Bid).  If a dispute arises over whether a Bid Deposit is refundable or non-refundable, the Bid Deposit shall remain in the Segregated Account pending a determination of the dispute by the Court or written agreement of the parties.

j.    If Qualified Bids have been submitted by more than one Qualified Bidder, the Qualified Bidder that makes the next-highest and/or best Qualified Bid to that of the proposed Winning Bidder at the conclusion of the Auction shall become the back-up bidder (the "Back-Up Bidder") and such Back-Up Bidder's final and highest and/or best Qualified Bid (the "Back-Up Bid") shall remain open and irrevocable pending the closing of the Winning Bid (the "Closing Date").  If a bid of the Stalking Horse Bidder is the next-highest and/or best bid to that of the proposed Winning Bidder, then such bid of the Stalking Horse Bidder shall be the Back-Up Bid.  If the transaction with the Winning

15

Bidder does not close prior to the Closing Date (as such date may be extended), the Back-Up Bid, as selected by the Debtors at the Auction and approved as the Back-Up Bid by the Court at the Sale Hearing, shall upon notice to the Back-Up Bidder by the Debtors (after consultation with the Secured Lenders and the Committee), be deemed the Winning Bid without further order of the Court, and the Back-Up Bidder shall be required to consummate the transaction in accordance with the Asset Purchase Agreement or Modified Agreement, as applicable.

k.      The Winning Bid (or the Asset Purchase Agreement, if no Qualified Bid other than that of the Stalking Horse Bidder is received or accepted) will be subject to approval by the Bankruptcy Court.   The Sale Hearing will take place before the Honorable Nancy V. Alquist, United States Bankruptcy Court, for the District of Maryland, Garmatz Federal Courthouse, 101 West Lombard Street, 2nd Floor, Courtroom #2A, Baltimore, Maryland 21201.  The Sale Hearing may be adjourned with the consent of the Winning Bidder from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

B.      The Bid Protections

29.      The Stalking Horse Bidder has expended considerable time, energy and resources pursuing the purchase of the Purchased Assets and the assumption and assignment of the Purchased Contracts, and has engaged in good faith negotiations.   The Asset Purchase Agreement is the culmination of these efforts.

30.      In recognition of this expenditure of time, energy, and resources, and consistent with its obligations under the Asset Purchase Agreement, the Debtors have agreed to pay the Break-Up Fee in the event the Asset Purchase Agreement is not consummated.   The Debtors have also agreed to the Expense Reimbursement in an amount up to $125,000 for reasonable transaction expenses of the Stalking Horse Bidder if the Purchased Assets are sold to a third party in a sale pursuant to section 363 of the Bankruptcy Code.

31.      Additionally, the Debtors have also agreed to bidding protections in the form of a $550,000 minimum initial overbid increment (the "Initial Overbid"), and minimum bid increments thereafter in the Auction are to be $100,000 (the "Subsequent Bid Increments" and

collectively with the Initial Overbid, the "<u>Bid Increments</u>").  For purposes of evaluating the value of the consideration provided by subsequent bids in the Auction, the Stalking Horse Bidder will be given a credit equal to the Break-Up Fee and the Expense Reimbursement.

32.     The Debtors have further agreed that their obligation to pay the Break-Up Fee shall survive termination of the Asset Purchase Agreement as a result an Alternative Transaction with a party other than the Stalking Horse Bidder, shall constitute an administrative expense claim under section 503(b) of the Bankruptcy Code and shall be payable pursuant to the terms and conditions of the Asset Purchase Agreement and the Sale Procedures Order, notwithstanding section 507(a) of the Bankruptcy Code.

C.     <u>The Notice Procedures</u>

33.     The Debtors propose to give notice immediately after the entry of the Sale Procedures Order (or as soon thereafter as reasonably practicable) of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice (the "<u>Sale Notice</u>"), substantially in the form attached hereto as <u>Exhibit D</u>, by first-class mail, postage prepaid, upon (i) the United States Trustee, (ii) counsel for Siena, (iii) counsel for Frozen Foods, (iv) counsel to any known secured creditors of record, (v) the twenty (20) largest unsecured creditors of the Debtors, (vi) counsel to the Stalking Horse Bidder, (vii) any known party asserting a lien against any of the Debtors' assets, (viii) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (ix) all governmental agencies that are an interested party with respect to the Sale, (x) any parties who have expressed a written interest in the Assets; (xi) all other known creditors of the Debtors and (xii) all parties that have filed a notice of appearance and demand for service of

papers in these bankruptcy cases under Bankruptcy Rule 2002 as of the date of the Sale Procedures Order (collectively, the "Notice Parties").

34.     The Debtors propose to give notice of the Sale to the non-Debtor counterparties to contracts that may be assumed (individually the "Counterparty" and together the "Counterparties") in accordance with the provisions outlined below.

D.     The Assignment Procedures

35.     To facilitate and effect the sale of the Assets, the Debtors seek authorization to assume certain prepetition executory contracts and unexpired leases (the "Contracts") of the Debtors with respect to the Assets (the "Purchased Contracts"), and to assign such executory contracts to the Stalking Horse Bidder or such other Winning Bidder.

36.     In light of the foregoing and the need to coordinate the sale of the Assets, the Debtors submit the following procedures (the "Assignment Procedures") for the Court's approval:

      a.     No later than five (5) days after the entry of the Sale Procedures Order, the Debtors shall file with the Court and serve via first class mail on all parties known by the Debtors to be a counterparty to a Contract, a notice of assumption, assignment, sale and cure substantially in the form attached hereto as Exhibit E (the "Notice of Assumption, Assignment and Sale"). The Notice of Assumption, Assignment and Sale shall include (a) a statement that the Contracts listed therein may be treated as "Purchased Contracts" under the Asset Purchase Agreement (or Asset Purchase Agreement or Modified Agreement) by their inclusion on Schedule 1.1(c) to the Asset Purchase Agreement (or a corresponding schedule in the Asset Purchase Agreement or Modified Agreement), (b) a statement that certain of the Contracts listed therein may be designated as "Designation Right Assets" under the Asset Purchase Agreement (or Asset Purchase Agreement or Modified Agreement) and thereafter rejected or assumed, assigned and sold at a date subsequent to the Closing Date, and (c) the Debtors' calculation of the amount necessary, if any, to cure any and all defaults under the Contracts and compensate the counterparties thereto for pecuniary loss in respect of any such default(s) (the "Cure Amount") as a condition to assumption, assignment and sale of such Contract under Bankruptcy Code sections 363 and 365(b).

      b.     Any subsequent Notice of Assumption, Assignment and Sale that identifies a Contract that was not previously identified as being subject to assumption, assignment and sale under the Asset Purchase Agreement (or Asset Purchase Agreement

or Modified Agreement) or that reduces the Debtors' calculation of the Cure Amount (an "Amended Notice of Assumption, Assignment and Sale") shall provide a deadline of not less than seven (7) days from the date of service of such Amended Notice of Assumption, Assignment and Sale by which the counterparty to any modification may object to (a) the assumption, assignment and sale of such Contract pursuant to the Asset Purchase Agreement (or Stalking Horse Agreement or Modified Agreement); (b) the Debtors' calculation of the Cure Amount for such Contract; and (c) adequate assurance of performance, if such Contract was not previously identified as being subject to assumption, assignment and sale.

c.       The Debtors reserve the right to (i) provide Amended Notices of Assumption, Assignment and Sale up to the Closing of the Asset Purchase Agreement (or Stalking Horse Agreement or Modified Agreement); (ii) remove a Contract from the list of Purchased Contracts at any time prior to the Closing of such agreement, for any reason; and (iii) to remove a Contract from the list of Purchased Contracts after the closing of the Asset Purchase Agreement (or Stalking Horse Agreement or Modified Agreement), if the Court determines after such Closing that the Cure Amount for such Contract is in excess of the amount set forth on Exhibit 1 to the Notice of Assumption, Assignment and Sale. The removal of any such Contract shall not reduce the purchase price to be paid by the Winning Bidder. In addition, one or more of the Contracts listed on Exhibit 1 to the Notice of Assumption, Assignment and Sale may be designated as a Designation Right Asset at the Closing of the asset purchase agreement submitted by the Winning Bidder (including the Stalking Horse Bidder) and in such case may be assumed by the Debtors and assigned and sold to the designated Person, if it makes a written election to accept an assignment of such Contract within the time frame provided in the Winning Bidder's (including the Stalking Horse Bidder's) asset purchase agreement.

d.       Any counterparty to a Contract shall file and serve on the Objection Recipients any objections to (a) the proposed assumption, assignment and sale of its Contract to the Winning Bidder (and must state in its objection, with specificity, the legal and factual basis of its objection) and (b) if applicable, the proposed Cure Amount (and must state in its objection, with specificity, what Cure Amount is required with appropriate documentation in support thereof), no later than [two (2) days prior to the Sale hearing] (prevailing Eastern Time); provided, however, that to the extent the Winning Bidder is an entity other than the Stalking Horse Bidder, any supplemental or further objections to the assumption, assignment and sale of a Contract to the Winning Bidder by a counterparty to such Contract, based solely on the Winning Bidder(s)' and/or Backup Bidder(s)' adequate assurance of future performance under any such Purchased Contract shall be filed no later than one (1) day prior the Sale Hearing. If no objection is timely filed and served, (x) the counterparty to a Contract shall be deemed to have irrevocably consented to the assumption, assignment and sale of the Contract to the Winning Bidder and shall be forever barred from asserting any objection with regard to such assumption, assignment and sale, and (y) the Cure Amount set forth in the Notice of Assumption, Assignment and Sale (or Amended Notice of Assumption, Assignment and Sale) shall be controlling, notwithstanding anything to the contrary in any Contract, any other document or applicable law, and the counterparty to the Contract shall be deemed to have irrevocably consented to the Cure Amount and shall be forever barred from

19

asserting any other claims related to such Contract against the Debtors or the Winning Bidder, or the property of any of them.

e.       If the Winning Bidder or the Back-Up Bidder at the Auction is not the Stalking Horse Bidder (or there is no Stalking Horse Bidder), then within one (1) day after the Auction, the Debtors shall file and serve on each counterparty to the Contracts, a supplemental Notice of Assumption, Assignment and Sale identifying the Winning Bidder and Back-Up Bidder (if applicable) and providing information regarding the Winning Bidder's and Back-Up Bidder's (if applicable) adequate assurance.

37.      The Debtors' assumption and assignment of the Purchased Contracts is subject to Court approval and consummation of the Sale.  The Debtors shall be deemed to have assumed each of the Purchased Contracts as of the date of and effective only upon the Closing Date of the Asset Purchase Agreement or a similar agreement entered into between the Debtors and any Winning Bidder.  Absent such closing, the Purchased Contracts shall be deemed neither assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

38.      The Debtors request that the Court grant authorization to seek approval of the assumption and assignment of the Purchased Contracts through this Motion and the notice and procedures set forth in the Assignment Procedures (which are consistent with the use of an omnibus motion pursuant to Bankruptcy Rule 6006(f)(6)).

39.      To facilitate the assumption and assignment of the Purchased Contracts, the Debtors further request that the Court find the anti-assignment provisions of the Purchased Contracts, if any, to be unenforceable under section 365(f) of the Bankruptcy Code.

E.       Sale of the Assets Free and Clear of all Liens, Claims and Encumbrances

40.      The Debtors have agreed to sell and transfer their right, title and interest in the Assets, free and clear of any and all liens, claims, encumbrances and interests pursuant to section 363 of the Bankruptcy Code to the maximum extent allowed by section 363 of the Bankruptcy Code.

41.     The Debtors seek a finding by the Court that upon the Closing, and except as otherwise expressly provided in the Asset Purchase Agreement, the Stalking Horse Bidder, or such other Winning Bidder, shall not be liable for any claims against, and interests in and obligations of, the Debtors or any of the Debtors' predecessors or affiliates or the assets of each of the respective entities.  The Debtors further seek a finding by the Court that as of the Closing, subject to the provisions of the Sale Order, the Stalking Horse Bidder, or such other Winning Bidder shall succeed to the entirety of the Debtors' rights and obligations in the Purchased Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

F.     <u>No Successor Liability</u>

42.     The Sale of the Assets to the Stalking Horse Bidder, or such other Winning Bidder is not being undertaken for the purpose of escaping liability for any of the Debtors' debts or hindering, delaying or defrauding creditors.  Accordingly, the Debtors request that the Sale Order provide that the Stalking Horse Bidder is not a mere continuation of the Debtors or their estates, that there is no continuity or common identity between the Stalking Horse Bidder and any of the Debtors, that there is no continuity of enterprise between the Stalking Horse Bidder and any of the Debtors, and that the Stalking Horse Bidder is not a successor to any of the Debtors or their estates and the Sale does not amount to a consolidation, merger or *de facto* merger of the Stalking Horse Bidder with or into any of the Debtors.

G.     <u>Assumption and Assignment of the Purchased Contracts</u>

43.     Pursuant to section 365(f) of the Bankruptcy Code, the Debtors seek authorization and approval to assume and assign the Purchased Contracts to the Stalking Horse Bidder, or such other Winning Bidder notwithstanding any provision to the contrary in the Purchased Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment.

44.     Upon assumption of the Purchased Contracts by the Debtors and assignment to the Stalking Horse Bidder, or such other Winning Bidder, the Purchased Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of the Sale Order.

H.     Relief Under Bankruptcy Rules 6004(h) and 6006(d)

45.     In order to maximize the value of the Assets and preserve the viability of the Debtors' business to which the Assets relate, it is essential that the Sale occur within the time constraints set forth in this Motion, the Sale Procedures Order, and the Asset Purchase Agreement.  Accordingly, the Debtors submit that there is cause to waive the 14 day stay contemplated by Bankruptcy Rules 6004 and 6006.

I.     Request to Set Date for Sale Hearing

46.     After the Auction, the Debtors intend to present the Winning Bid with respect to the Assets, for approval by the Court at the Sale Hearing to be scheduled by the Court.  The Debtors shall be deemed to have accepted a bid only when the Court has approved the bid at the Sale Hearing.

**BASIS FOR RELIEF REQUESTED**

A.     The Sale Should be Approved in the Exercise of the Debtors'
       Sound Business Judgment

47.     Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b).  A debtor must articulate a valid business justification to obtain court approval to proceed with asset sales outside of the ordinary course of business under section 363(b) of the Bankruptcy Code.  *See, e.g., United States ex rel. Rahman v. Oncology Assocs., P.C.*, 269 B.R. 139, 161 (D. Md. 2001) ("The standard to be applied by a court in

determining whether or not to approve the disposition of property [under Section 363 of the Bankruptcy Code] is whether the trustee exercised sound business judgment."); *In re Modanlo*, 412 B.R. 715, 732 (Bankr. D. Md. 2006); *see also Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991). Generally, courts within the Fourth Circuit require a debtor to satisfy the four following requirements in connection with a sale under section 363 of the Bankruptcy Code: "(1) a sound business purpose exists; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith." *In re Shipman*, 344 B.R. 493, 495 (Bankr. N.D. W. Va. 2006); *In re Childers*, __ B.R. __, 2015 WL 757616, *3 (Bankr. D.S.C. Feb. 19, 2015).

48.     When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *F.D.I.C. v. Baldini*, 983 F. Supp. 772, 780 (S.D. W. Va. 2013); *see also In re LandAmerica Fin. Group, Inc.*, 470 B.R. 759, 792 (Bankr. E.D. Va. 2012). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts, absent a showing of bad faith, self interest, or gross negligence, will uphold a board's decisions as long as they are attributable to any rational business purpose. *See Poth v. Russey*, 281 F. Supp. 2d 814, 826 (E.D. Va. 2003).

49.     The proposed sale of the Assets meets the "sound business judgment" test. First, sound business purposes justify the Sale. A prompt sale of the Assets, conducted pursuant to the

Bidding Procedures, represents the best opportunity for maximizing distribution of assets to the Debtors' estates and creditors. The value of the Assets will be adversely affected absent a prompt sale. *See On-Site Sourcing, Inc.*, 412 B.R. 817, 823 (Bankr. E.D. Va. 2009) (quoting *Committee of Equity Security Holders v. The Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2nd Cir. 1983 (noting that, of factors for a court to evaluate on motion under section 363(b), "most important[] perhaps, [is] whether the asset is increasing or decreasing in value").

50.     The Debtors have sought to establish procedures for providing accurate and reasonable notice to creditors and other prospective bidders. The notice period proposed satisfies the requirements of the Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the Sale and for bidders to formulate and submit competing proposals.

51.     The terms of the Asset Purchase Agreement represent a fair and reasonable price for the Assets. The proposed procedures for the Sale satisfy the good faith requirement. The results of any Auction will be the product of good faith, arm's-length negotiations with respect to the price and other terms of the sale of the Assets between the Debtors and highest and best bidder at the conclusion of the Auction.

52.     The Debtors have demonstrated sound business justifications for authorizing the sale of the Assets, entry into the Asset Purchase Agreement, and the procedures set forth herein and in the Sale Procedures Order. The sale of the Assets pursuant to the Bidding Procedures will afford the Debtors the best opportunity to maximize the recovery to creditors. Accordingly, the Debtors request that the Court approve the proposed sale of the Assets to the Stalking Horse Bidder or such other Winning Bidder.

B.     The Bidding Procedures are Appropriate Under the Circumstances

53.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary

24

course of business may be by private sale or public auction.  The Debtors have determined that the sale of the Assets, pursuant to the Bidding Procedures and by public auction, will ensure that the bidding process with respect to the Assets is fair and reasonable and will yield the maximum value for their estates and creditors.

54.    Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See In re Antaeus Tech. Servs., Inc.*, 345 B.R. 556, 575 (Bankr. W.D. Va. 2005) (approving bidding procedures in order "[t]o ensure the Trustee is able to maximize the recovery for the Debtor's estate and to provide an orderly process for receiving competing offers"); *see also In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) (as amended) ("[C]ourt-imposed rules for the disposition of assets . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.").

55.    The Bidding Procedures take into account the work that the Debtors have done in identifying potential buyers, and soliciting and receiving offers.  As a result, consistent with the Bidding Procedures, only those parties that submitted Qualified Bids are eligible to participate in the Auction.  Accordingly, the Debtors are asking that the Court set May 18, 2015, 2015 as the Bid Deadline and May 20, 2015 as the Auction date, and believe that is ample time for bidders to formulate and submit bids and prepare for the Auction.

56.    The Debtors believe that the Bidding Procedures will ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bidding Procedures provide for a straight-forward auction process pursuant to which the bidder that submits the highest or otherwise best offer will be selected to as the ultimate

purchaser of the Assets.

57.      Similar procedures have been previously approved by this Court and in other jurisdictions.  *See, e.g.*, *In re Capital Trust Holdings, Inc.*, No. 14-11952 (DER), Dkt. No. 122 (Bankr. D. Md. Mar. 8, 2014); *In re Neogenix Oncology, Inc.*, No. 12-23557 (TJC), Dkt. No. 122 (Bankr. D. Md. Sept. 20, 2012) (approving bidding procedures); *In re Frank Parsons, Inc.*, No. 11-10338 (RAG), Dkt. No. 255 (Bankr. D. Md. Apr. 20, 2011) (same); *In re Cloverleaf Enters., Inc.*, No. 09-20056 (PM), Dkt. No. 712 (Bankr. D. Md. Jan. 21, 2011) (same); *In re N. Texas Bancshares, Inc.*, No. 13-12699 (KG), Dkt. No. 134 (Bankr. D. Del. Nov. 25, 2013) (same); *In re Mercantile Bancorp, Inc.*, No. 13-11634 (KJC), Dkt. No. 109 (Bankr. D. Del. Aug. 8, 2013) (same).

58.      Accordingly, the Debtors request that the Court approve the Bidding Procedures, including the timetable for the sale process set forth therein.

C.      The Bidding Protections Should be Approved

59.      In *In re Lamb*, No. 96-1-1099, 2002 WL 31508913, *1 (Bankr. D. Md. Oct. 11, 2002), this Court cited with approval the Third Circuit's decision in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999).  *See also In re Tropea*, 352 B.R. 766, 768 (Bankr. N.D. W. Va. 2006).  In *O'Brien*, the court held that while bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  To be approved, bidding incentives such as a break-up fee must provide benefit to a debtor's estate.  *Id.* at 533.

60.      The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee

26

promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would [be] limited." *Id.* at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

61.     Here, the Break-Up Fee and Expense Reimbursement should be approved because they will provide a clear benefit to the Debtors' estates. The Break-Up Fee and Bid Increments will enable the Debtors to establish an adequate floor for the price of the Assets, and insist that competing bids be materially higher or otherwise better than the Asset Purchase Agreement. Thus, the Debtors' ability to offer the Break-Up Fee, Expense Reimbursement and Bid Increments enables the Debtors to ensure the sale of the Assets to a committed bidder at a price they believe to be fair while, at the same time, providing the Debtors with the potential of even greater benefit to their estates.

62.     The amount of the Break-Up Fee and Expense Reimbursement are reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder. The Debtors believe that the amount, and conditions for payment of the Break-Up Fee and Expense Reimbursement are within the range of break-up fees typically employed in bankruptcy sale transactions. Moreover, payment of the Break-Up Fee and Expense Reimbursement will not diminish the Debtors' estates. The Debtors do not intend to terminate the Asset Purchase Agreement if to do so would incur an obligation to pay the Break-Up Fee and Expense reimbursement, unless to accept an alternative bid, which bid must exceed the consideration offered by the Stalking Horse Bidder by an amount sufficient to

pay the Break-Up Fee and Expense Reimbursement. Therefore, even if the Stalking Horse Bidder is ultimately not determined to be the Winning Bidder, the Debtors will still have benefited from the higher floor established by the improved bid and thereby increase the likelihood that the price at which the Assets are sold reflects their true worth. Accordingly, the Debtors request that the Court approve and authorize the Break-Up Fee, Expense Reimbursement and Bid Increments.

D.    Sale Free and Clear of all Liens, Claims and Encumbrances

63.    The Debtors request that the Court authorize the sale of the Assets free and clear of any and all liens, claims and encumbrances (collectively, the "Liens") with any such Liens to attach to the net proceeds of the sale, subject to the rights and defenses of the Debtors, if any, with respect thereto.

64.    In accordance with section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien or interest in or against such property if:

> (i)    such a sale is permitted under applicable non-bankruptcy law;
>
> (ii)   the party asserting such a lien, claim or interest consents to such sale;
>
> (iii)  the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property;
>
> (iv)   the interest is the subject of a bona fide dispute; or
>
> (v)    the party asserting the interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

*See* 11 U.S.C. § 363(f); *see also In re Collins*, 180 B.R. 447, 449-50 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only *one* of the enumerated conditions must be met in order for the Court to approve the proposed sale."); *In re P.K.R. Convalescent Centers, Inc.*, 189 B.R. 90, 94 (Bankr. E.D. Va. 1995) ("[Section] 363 covers more situations than just sales involving liens . . . . Section 363(f) addresses sales free and clear of *any*

28

*interest*.").    Furthermore, pursuant to section 105 of the Bankruptcy Code, the Court may authorize the sale of a debtor's assets free and clear of any claims.  *See In re White Motor Credit Corp.*, 75 B.R. 944, 948-49 (Bankr. N.D. Ohio 1987); *see also In re Daufuskie Island Props., LLC*, 431 B.R. 626, 648 (Bankr. D.S.C. 2010).

65.    The Sale provides that any Liens will attach to the proceeds from the sale of the Assets with the same force and effect as such Liens previously had on the Assets, subject to the rights and defenses of the Debtors with respect thereto.  The Debtors submit that the sale of the Assets free and clear of any Liens satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

66.    A sale free and clear of Liens is necessary to maximize the value of the Assets. The Stalking Horse Bidder would not have entered into the Asset Purchase Agreement and would not consummate the Sale if the sale of the Assets to the Stalking Horse Bidder were not free and clear of all Liens, or if the Stalking Horse Bidder would, or in the future could, be liable for any of such Liens.  A sale of the Assets other than one free and clear of all Liens would yield substantially less value for the Debtors' estates, with less certainty than the proposed Sale.  A sale free and clear of Liens is particularly appropriate under the circumstances, because any lien or claim in, to or against the Debtors' right, interest and title in the Assets that exists immediately prior to the closing of any sales will attach to the sale proceeds allocated to the Debtors with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest.

E.    Finding of Good Faith for Purposes of Section 363(m) of the Bankruptcy Code

67.    As will be set forth in further detail at the Sale Hearing, the Debtors also maintain that the Stalking Horse Bidder is entitled to the protections afforded by section 363(m) of the

Bankruptcy Code.

68.    Specifically, section 363(m) provides that:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

69.    While the Bankruptcy Code does not define "good faith," courts have held that:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings. Typically,
> the misconduct that would destroy a purchaser's good faith status at a
> judicial sale involves fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair advantage of
> other bidders.

*In re Lady H Coal Co., Inc.*, 193 B.R. 233, 244 (Bankr. S.D. W. Va. 1996) (quoting *In re Abbotts*

*Dairies, Inc.*, 788 F.2d 143, 148 (3d Cir. 1986)). *see generally Marin v. Coated Sales, Inc., (In re*

*Coated Sales, Inc.)*, No. 89-3704, 1990 WL 212899, at *2 (S.D.N.Y. Dec. 13, 1990) (holding

that party, to show lack of good faith, must demonstrate "fraud, collusion . . . , or an attempt to

take grossly unfair advantage of other bidders").

70.    The proposed sale of the Assets to the Stalking Horse Bidder is in good faith.  As

discussed above, the Debtors and the Stalking Horse Bidder negotiated the terms of the Asset

Purchase Agreement at arm's length and in good faith .  There is no evidence of fraud or

collusion in the terms of the proposed sale.  This Court should find that the Stalking Horse

Bidder is entitled to all of the protections of section 363(m).  The Bidding Procedures are

designed to ensure that no party is able to exert undue influence over the process.  For these

reasons, the Debtors respectfully submit that the Stalking Horse Bidder has acted in good faith

within the meaning ascribed to the terms by the courts in this Circuit.  Moreover, if the Debtors

ultimately sell the Assets to an alternative Winning Bidder, the Debtors believe that a finding of

good faith within the meaning of section 363(m) of the Bankruptcy Code would be appropriate.

F.    <u>The Assumption and Assignment of the Purchased Contracts Should Be Authorized</u>

71.    Under section 365(a) of the Bankruptcy, a debtor, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §

365(a).    Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for

assuming an executory contract of a debtor. This subsection provides:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the
> debtor, the trustee may not assume such contract or lease unless, at the time of assumption
> of such contract or lease, the trustee –
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure,
> such default...;
> (B)    compensates, or provides adequate assurance that the trustee will promptly
> compensate, a party other than the debtor to such contract or lease, for any actual
> pecuniary loss to such party resulting from such default; and
> (C)    provides adequate assurance of future performance under such contract or
> lease.

11 U.S.C. § 365(b)(1).    Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part,

that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if --
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of
> this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or
> lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).    The meaning of "adequate assurance of future performance" depends on

the facts and circumstances of each case, but should be given "practical, pragmatic construction .

. . ." *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide*

*Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992) (internal citations omitted); *In re Prime Motor Inns*

*Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

72.     A demonstration of the assignee's financial health and experience in managing the type of enterprise or property assigned may constitute adequate assurance.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

73.     To the extent any defaults exist under any Purchased Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Stalking Horse Bidder or other Winning Bidder and willingness and ability to perform under the Purchased Contracts.  The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or other Winning Bidder to provide adequate assurance of future performance under the Purchased Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

74.     It is an exercise of the Debtors' sound business judgment to assume and assign the Purchased Contracts to the Stalking Horse Bidder or other Winning Bidder in connection with the consummation of the Sale, and the assumption, assignment and sale of Purchased Contracts is in the best interests of the Debtors, their estates and creditors.  The Purchased Contracts being assigned to the Stalking Horse Bidder or other Winning Bidder are an integral part of the Assets being purchased by the Stalking Horse Bidder, and accordingly, such assumption, assignment

and sale of Purchased Contracts are reasonable and enhance the value of the Debtors' estates. Accordingly, the Court should authorize the Debtors to assume and assign the Purchased Contracts as set forth herein.

G.    Relief under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

75.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  Under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

76.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally* 10 Collier on Bankruptcy 10-6004.11 (16th ed. 2010).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

77.    Pursuant to the Asset Purchase Agreement, the Debtors must close the Sale promptly after all closing conditions have been met or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

**NOTICE**

78.    Notice of this Motion has been given to the following parties: (i) the United States Trustee, (ii) counsel for Siena, (iii) counsel for Frozen Foods, (iv) counsel to any known secured creditors of record, (v) the twenty (20) largest unsecured creditors of the Debtors, (vi) counsel to the Stalking Horse Bidder, (vii) any known party asserting a lien against any of the Debtors' assets, (viii) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (ix) all governmental agencies that are an interested party with respect to the Sale, (x) any parties who have expressed a written interest in the Assets; (xi) all other known creditors of the Debtors and (xii) all parties that have filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 2002 as of the date of this Motion.

**NO PRIOR REQUEST**

79.    No previous request for the relief sought in this Motion has been made to this Court or any other court.

**MOTION TO SHORTEN TIME FOR BIDDING PROCEDURES**

80.    THE DEBTORS ARE SIMULTANEOUSLY FILING A MOTION TO SHORTEN TIME WITH RESPECT TO THE BIDDING PROCEDURES FOR AN EXPEDITED HEARING ON THE BIDDING PROCEDURES ONLY.  IF THAT MOTION TO SHORTEN TIME IS GRANTED, THE TIME TO OBJECT TO THE BIDDING PROCEDURES WILL BE SHORTENED AND THE TIME FOR A HEARING WILL BE SET AS SET FORTH IN SUCH ORDER SHORTENING TIME.  SEPARATE NOTICE OF THE OBJECTION DEADLINE AND HEARING DATE WITH RESPECT TO THE BIDDING PROCEDURES WILL BE PROVIDED IF THE MOTION TO SHORTEN IS GRANTED.

WHEREFORE, the Debtors respectfully request the entry of orders substantially in the form attached hereto, granting the relief requested herein, and such other and further relief as is just and proper.

Dated:  April 10, 2015

WHITEFORD TAYLOR & PRESTON LLP

*/s/ Dennis J. Shaffer*
Paul M. Nussbaum (Bar No. 04394)
John F. Carlton (Bar No. 06591)
Dennis J. Shaffer (Bar No. 25680)
Seven Saint Paul Street, 15th Floor
Baltimore, Maryland 21202-1636
(410) 347-8700
pnussbaum@wtplaw.com
jcarlton@wtplaw.com
dshaffer@wtplaw.com

*Counsel for the Debtors*

## CERTIFICATE OF SERVICE

I certify that on the 10th day of April, 2015, I caused to be served, through the Debtors' proposed noticing agent, the foregoing upon those parties on the attached service list (i) by overnight mail to all parties on the list, and (ii) by facsimile and electronic mail to those indicated therein.

*/s/  Dennis J. Shaffer*
Dennis J. Shaffer

*2131708*