# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**GOURMET EXPRESS, LLC, GOURMET EXPRESS ACQUISITION FUND, LLC AND GOURMET EXPRESS HOLDINGS, LLC, AS SELLERS**

**AND**

**GENESIS MERCHANT PARTNERS, LP AND GENESIS MERCHANT PARTNERS II, LP, AS BUYER**

**Dated as of April 7, 2015**

# <u>TABLE OF CONTENTS</u>

**Page(s)**

ARTICLE I DEFINITIONS .................................................................................1
    Section 1.1    Certain Definitions..................................................................1
    Section 1.2    Other Definitional and Interpretive Matters .................................10

ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES .........11
    Section 2.1    Purchase and Sale of Assets.......................................................11
    Section 2.2    Excluded Assets......................................................................13
    Section 2.3    Excluded Liabilities.................................................................14
    Section 2.4    Assumed Liabilities.................................................................15
    Section 2.5    Purchased Assets.....................................................................16
    Section 2.6    Further Conveyances and Assumptions.......................................16
    Section 2.7    Transitional Matters ...............................................................16

ARTICLE III CONSIDERATION ....................................................................19
    Section 3.1    Purchase Price........................................................................19

ARTICLE IV CLOSING AND TERMINATION.................................................19
    Section 4.1    Closing Date...........................................................................19
    Section 4.2    Deliveries by Sellers ...............................................................20
    Section 4.3    Deliveries by Buyer ................................................................20
    Section 4.4    Termination of Agreement........................................................20
    Section 4.5    Effect of Termination; Payment of Break-Up Fee & Expense
                  Reimbursement......................................................................22
    Section 4.6    Other Effects of Termination .....................................................23

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS..............................23
    Section 5.1    Authorization of Agreement ......................................................23
    Section 5.2    No Conflicts...........................................................................23
    Section 5.3    Title to Purchased Assets..........................................................24
    Section 5.4    Real Property..........................................................................24
    Section 5.5    Tangible Personal Property.........................................................24
    Section 5.6    Intellectual Property.................................................................24
    Section 5.7    Financial Statements................................................................25
    Section 5.8    Financial Advisors...................................................................25
    Section 5.9    Litigation..............................................................................25
    Section 5.10    Compliance with Laws ............................................................25
    Section 5.11    Permits ................................................................................25
    Section 5.12    Purchased Inventory...............................................................26
    Section 5.13    Contracts..............................................................................26
    Section 5.14    Taxes..................................................................................26
    Section 5.15    Labor Matters........................................................................27
    Section 5.16    Designation Rights Budget .......................................................27
    Section 5.17    No Other Agreements to Purchase..............................................27

Section 5.18    No Other Buyer Representations ................................................................27

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER....................................27
Section 6.1    Organization and Good Standing...............................................27
Section 6.2    Authorization of Agreement .......................................................27
Section 6.3    Financial Advisors .......................................................................28
Section 6.4    No Conflicts ................................................................................28
Section 6.5    Litigation....................................................................................28
Section 6.6    Condition of the Business ...........................................................28
Section 6.7    Disclaimer Regarding Projections .............................................28

ARTICLE VII BANKRUPTCY COURT APPROVAL/ MATTERS........................................29
Section 7.1    Bankruptcy Court Filings............................................................29
Section 7.2    Break-Up Fee and Buyer Expense Reimbursement.....................30

ARTICLE VIII COVENANTS...............................................................................................30
Section 8.1    Access to Information.................................................................30
Section 8.2    Further Assurances....................................................................30
Section 8.3    Confidentiality ...........................................................................30
Section 8.4    Preservation of Records .............................................................31
Section 8.5    Operation of Business ................................................................31
Section 8.6    Section 363(b)(1)(A)...................................................................33
Section 8.7    Adequate Assurances Regarding Purchased Contracts and Certain
              Real Property Leases .................................................................34
Section 8.8    Notification of Certain Matters ..................................................34
Section 8.9    Prospective Employees ..............................................................34
Section 8.10   Name Change .............................................................................34
Section 8.11   Certain Financing Matters..........................................................35

ARTICLE IX CONDITIONS TO CLOSING ........................................................................35
Section 9.1    Conditions Precedent to Obligations of Buyer ...........................35
Section 9.2    Conditions Precedent to Obligations of Sellers ..........................36
Section 9.3    Conditions Precedent to Obligations of Buyer and Sellers..........37
Section 9.4    Frustration of Closing Conditions...............................................37

ARTICLE X NO SURVIVAL...............................................................................................37
Section 10.1   No Survival of Representations and Warranties ..........................37

ARTICLE XI TAX MATTERS..............................................................................................37
Section 11.1   Transfer Taxes ...........................................................................37
Section 11.2   Proration....................................................................................37
Section 11.3   Purchase Price Allocation ..........................................................38

ARTICLE XII MISCELLANEOUS.......................................................................................38
Section 12.1   Expenses ....................................................................................38
Section 12.2   Submission to Jurisdiction; Consent to Service of Process ..........38
Section 12.3   Waiver of Right to Trial by Jury.................................................39

Section 12.4    Entire Agreement; Amendments and Waivers .............................................39
Section 12.5    Governing Law ..............................................................................................39
Section 12.6    Notices ............................................................................................................39
Section 12.7    Severability .....................................................................................................40
Section 12.8    Binding Effect Assignment............................................................................41
Section 12.9    No Effect Upon Lending Relationships.........................................................41
Section 12.10   Counterparts ....................................................................................................41

**EXHIBITS**

Exhibit A                Sale Procedures Order
Exhibit B                Sale Order


**SCHEDULES**

Schedule 1.1(a)          Contracts
Schedule 1.1(b)          Real Property
Schedule 1.1(c)          Purchased Contracts
Schedule 1.1(d)          Purchased Intellectual Property
Schedule 2.1(t)          Additional Purchased Assets
Schedule 2.2(f)          Additional Excluded Assets
Schedule 2.4(a)          Assumed Liabilities
Schedule 2.4(e)          Cure Amounts
Schedule 5.2             No Conflicts
Schedule 5.8             Financial Advisors
Schedule 5.9             Litigation
Schedule 5.10            Compliance with Laws
Schedule 5.11            Permits
Schedule 5.14            Tax Audits
Schedule 8.5(i)          Affiliate Transactions

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated as of April 7, 2015 (this "**Agreement**"), is entered into by and among Gourmet Express, LLC, a Texas limited liability company, Gourmet Express Acquisition Fund, LLC, a Maryland limited liability company, and Gourmet Express Holdings, LLC, a Maryland limited liability company (collectively, "**Sellers**"), and Genesis Merchant Partners, LP and Genesis Merchant Partners II, LP (and together with its designee(s), as provided under <u>Section 12.8</u>, "**Genesis**" or "**Buyer**").

## WITNESSETH:

**WHEREAS**, Sellers and Genesis are parties to the Third Lien Credit Agreement;

**WHEREAS**, on March 16, 2015, Sellers commenced cases (the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code (as it may be amended from time to time as applicable to the Bankruptcy Cases, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Maryland (the "**Bankruptcy Court**") (the date of such commencement being referred to as the "**Petition Date**");

**WHEREAS**, Sellers continue in possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession;

**WHEREAS**, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined below) and Assumed Liabilities (as defined below) as more specifically provided herein; and

**WHEREAS**, certain terms used in this Agreement are defined in Section 1.1.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    **Certain Definitions**.  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"**Accounts Receivable**" means (a) all accounts receivable and other rights to payment from customers of Sellers and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Sellers, (b) all other accounts or notes receivable of Sellers and the full benefit of all security for such accounts or notes and (c) any vender rebate, claim, remedy or other right related to any of the foregoing.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "controlled by" and "<u>under</u>

<u>common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Alternative Transaction**" means the sale, transfer, lease or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction by the Sellers, of all or any material portion of the Purchased Assets (or the consummation of such a transaction without prior agreement of Buyer) in a transaction or series of transactions to a party or parties other than the Buyer.

"**Approved Budget**" means the budget established pursuant to the DIP Order and any subsequent budget, in form and substance acceptable to Buyer, that collectively extend through and including the Closing Date, as supplemented, modified or amended with the express written consent of Buyer.

"**Assumed Liabilities**" shall have the meaning set forth in <u>Section 2.4</u>.

"**Auction**" shall have the meaning ascribed to it in the Sales Procedures Order.

"**Bankruptcy Cases**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Break-Up Fee**" has the meaning set forth in <u>Section 4.5</u>.

"**Business**" means the business and operations of Sellers producing and selling frozen foods and related products.

"**Business Day**" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"**Buyer**" shall have the meaning set forth in the Preamble.

"**Buyer Employees**" has the meaning set forth in <u>Section 8.9(a)</u>.

"**Cash Payment**" shall have the meaning set forth in <u>Section 3.1(b)</u>.

"**Claim**" has the meaning given to such term in Section 101(5) of the Bankruptcy Code.

"**Closing**" shall have the meaning set forth in <u>Section 4.1</u>.

"**Closing Date**" shall have the meaning set forth in <u>Section 4.1</u>.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contract**" means any written contract, indenture, commitment, purchase or sale order, note, bond, lease, Real Property Lease, Personal Property Lease, franchise agreement or other

- 2 -

agreement (including, without limitation, employment and consulting agreements) to which any Seller is a party as set forth on Schedule 1.1(a); provided, however, for purposes of Article V hereunder, "**Contracts**" shall not include purchase or sale orders.

"**Credit Bid Amount**" has the meaning set forth in Section 3.1(a).

"**Cure Amounts**" means any and all amounts required, as a condition to assumption and assignment, to be paid to a non-debtor party to a Purchased Contract pursuant to Section 365(b) of the Bankruptcy Code.

"**Designation Cost Overage**" has the meaning set forth in Section 2.7(c).

"**Designation Notice**" has the meaning set forth in Section 2.7(c).

"**Designation Rights Asset**" has the meaning set forth in Section 2.7(c).

"**Designation Rights Budget**" has the meaning set forth in Section 2.7(c).

"**Designation Rights Period**" means the period commencing on the Closing Date and ending three (3) months after the Closing Date.

"**DIP Financing**" means the debtor-in possession financing under the First Lien Credit Agreement.

"**DIP Order**" means any Order of the Bankruptcy Court relating to the DIP Financing.

"**Documents**" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"**Employee Claim**" means any Claim, demand, action, cause of action, damage, loss, cost, Liability or expense, including legal costs, made or brought by any Employee, including, but not limited to, any Claim made pursuant to any applicable Laws relating to employment standards, occupational health and safety, labor relations, workers compensation, pay equity, employment equity, minimum wage, overtime, tip credit, the Consolidated Omnibus Budget Reconciliation Act, WARN, the Americans with Disabilities Act, the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Family and Medical Leave Act or the Fair Labor Standards Act or any other federal, state or local, statutory or decisional Law regarding employment discrimination or employee benefits.

"**Employee Obligations**" means all wages, bonuses, incentive, equity, equity-based or similar compensation obligations, deferred compensation arrangements, vacation pay, sick time, pension payments, overtime pay, change of control payments, severance pay and any other

termination or severance obligations and any other compensation or obligation which may be due by statute, contract or Law relating to the employment of the Employees in respect of the Business.

"**Employees**" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by Sellers in connection with the Business, together with individuals who are hired in respect of the Business after the date hereof and prior to the Closing.

"**Excluded Assets**" shall have the meaning set forth in Section 2.2, subject to Section 2.7(c).

"**Excluded Contracts**" means all Contracts other than Purchased Contracts, subject to Section 2.7(c).

"**Excluded Liabilities**" shall have the meaning set forth in Section 2.3.

"**Expense Reimbursement**" has the meaning set forth in Section 4.5.

"**Final Allocation**" has the meaning set forth in Section 11.3.

"**Final Order**" means an Order, judgment, or other decree of the Bankruptcy Court or other court of competent jurisdiction that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"**First Lien Credit Agreement**" means the Amended and Restated Loan and Security Agreement dated December 3, 2014, between the Sellers and the First Lien Lender, as amended by that Letter Agreement dated December 31, 2014 and as ratified and amended by that Amendment and Ratification Agreement dated as of April 1, 2015, as approved by the Bankruptcy Court pursuant to the DIP Order.

"**First Lien Lender**" means Siena Lending Group LLC.

"**First Lien Obligations**" means the amount then due and outstanding under the First Lien Credit Agreement.

"**Furniture and Equipment**" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or leased by Sellers, including all artwork, desks, chairs, tables, computer and computer-related hardware (including, computers, file servers, facsimile servers, scanners, printers, and networks), copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles, cash registers, point-of-sale equipment, warehouse equipment, and miscellaneous office furnishings and supplies.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"**Indebtedness**" of any Person means, without duplication, (i) the principal and interest of, and premium (if any) in respect of, (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Intellectual Property**" means all worldwide intellectual property rights of Sellers, including all (i) patents, patent applications and inventions, (ii) trademarks, service marks, trade names and trade dress, which expressly includes the goodwill and any common law rights associated with the foregoing, (iii) domain names, websites and mobile device applications, (iv) copyrights, including copyrights in computer software, (v) confidential and proprietary information, including trade secrets, confidential business information, research and development, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, and know-how ("**Trade Secrets**"), (vi) licenses relating to any of the foregoing, (vi) registrations and applications for registration and renewal of the foregoing, and (vii) any past, present or future Claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"**Inventory**" means all of Sellers' now owned or hereafter acquired inventory and goods, wherever located, including, without limitation, all inventory and goods that (a) are leased by any Seller as lessor, (b) are held by such Seller for sale or lease or to be furnished under a contract of service, (c) are furnished by any Seller under a Contract of service, or (d) consist of raw materials, food, work in process, finished goods or material used or consumed in connection with the Business.

"**Law**" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or Order.

"**Legal Proceeding**" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or Claims or any proceedings by or before a Governmental Body, and any appeal from any of the foregoing.

- 5 -

"**Liability**" means any Indebtedness, liability, obligation, commitment, expense, Claim, deficiency, guaranty or endorsement of any type whatsoever (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, Claim, lease, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, or transfer restriction under any shareholder or similar agreement or encumbrance; provided, however, that Assumed Liabilities which pertain to particular Purchased Assets shall not constitute Liens.

"**Material Adverse Effect**" means any event, change, circumstance or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have or result in (i) a material adverse effect on the business, assets, results of operations or financial condition of Sellers (taken as a whole), the Business or the Purchased Assets, or (ii) a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement or perform their obligations under this Agreement, other than (a) the effect of any change resulting from any action taken by Buyer or its Affiliates with respect to the transactions contemplated hereby or with respect to the Sellers; (b) any effect resulting from the filing or prosecution of the Bankruptcy Cases; (c) the effect of any change that generally affects any industry in which any Seller operates; (d) the effect of any change arising in connection with earthquakes, hostilities, national calamities, acts of war, acts of God, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, national calamities, acts of war, acts of God, political conditions, sabotage or terrorism or military actions existing or underway as of the date hereof; (e) the effect of any change in applicable Law or GAAP or interpretation thereof; (f) any public announcement of this Agreement; (g) any actions or inactions by Sellers in accordance with this Agreement or the consummation of the transactions contemplated by this Agreement; (h) the failure by the Sellers to meet any projections (provided that the underlying causes of the failure shall not be excluded); or (i) general economic, political or financial market conditions; provided that the foregoing clauses (c), (d), (e) and (i) shall not include, and therefore determination of "**Material Adverse Effect**" shall not exclude, any event, change, circumstance or occurrence that affect the Business, the Purchased Assets or the Assumed Liabilities in a disproportionate manner when compared to the effect of the same on other Persons engaged in the industries in which Sellers conduct the Business.

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"**Ordinary Course of Business**" means the ordinary and usual course of normal day-to-day operations of the Business consistent with the past practice of the Business through the date hereof, subject to any duties and restrictions imposed on Sellers under the Bankruptcy Code.

"**Parties**" means Sellers and Buyer and "**Party**" means any one of the Seller and Buyer Parties.

"**Permits**" means any approvals, authorizations, consents, licenses, permits or certifications of a Governmental Body.

"**Permitted Exceptions**" means (i) all defects, exceptions, restrictions, easements, rights of way, encumbrances and Liens of public record, disclosed pursuant to this Agreement or reflected in policies of title insurance which have been made available to or are obtained by Buyer and that would not interfere with the use of the Purchased Assets or conduct of the Business in accordance with historical practice; (ii) statutory Liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease, (vi) any Liens associated with or arising in connection with any Assumed Liabilities, and (vii) such other imperfections in title which would not materially interfere with the use of the Purchased Assets.

"**Person**" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"**Personal Property Leases**" shall have the meaning set forth in Section 5.5.

"**Petition Date**" shall have the meaning set forth in the Recitals.

"**Previously Omitted Contract**" has the meaning set forth in Section 2.7(d)(i).

"**Previously Omitted Contract Designation**" has the meaning set forth in Section 2.7(d)(i).

"**Previously Omitted Contract Notice**" has the meaning set forth in Section 2.7(d)(ii).

"**Products**" means any and all products developed, manufactured, procured, marketed or sold by Sellers, whether work in progress or in final form.

"**Prospective Employees**" shall have the meaning set forth in Section 8.9(a).

"**Purchase Price**" shall have the meaning set forth in Section 3.1.

"**Purchased Assets**" shall have the meaning set forth in Section 2.1.

"**Purchased Contracts**" means the Contracts set forth on Schedule 1.1(c), as such Schedule may be amended from time to time in accordance with this Agreement.

"**Purchased Intellectual Property**" means all Intellectual Property and related Software and Technology of the Sellers, including as set forth on Schedule 1.1(d), except such Intellectual Property that is specifically excluded by Buyer.

"**Real Property**" shall have the meaning set forth in Section 5.4.

"**Real Property Leases**" shall have the meaning set forth in Section 5.4.

"**Sale Order**" shall be an Order of the Bankruptcy Court, substantially in the form attached hereto as <u>Exhibit B</u> or as otherwise approved by Buyer in its sole and absolute discretion, approving this Agreement and all of the terms and conditions hereof, approving the sale and assignment to Buyer of all of the Purchased Assets, and approving and authorizing Sellers to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens (other than Liens specifically assumed or created by Buyer and Permitted Exceptions), Claims (other than Assumed Liabilities), encumbrances and interests (including Liens, Claims, encumbrances and interests of any Governmental Body), including any Claims or assertions based on successor or transferee liability, such Liens, Claims, encumbrances and interests to attach to the proceeds of sale of the Purchased Assets, and enjoining all persons holding Liens, Claims, encumbrances, and other interests, including rights or Claims based on any successor or transferee Liability, from asserting them against Buyer, (ii) the Purchased Contracts may be assumed by Sellers and assigned and sold to Buyer under Sections 363 and 365 of the Bankruptcy Code, (iii) Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to the full benefits of such provision, (iv) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, (v) Sellers and Buyer have not engaged in any conduct that would cause or permit this Agreement to be avoided under Section 363(n) of the Bankruptcy Code; (vi) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or Claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 12.2 hereof, (vii) this Agreement and the transactions contemplated hereby are binding upon, and not subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee of Sellers, (viii) neither Buyer nor any of its Affiliates shall be deemed a successor in interest to Sellers, and (ix) upon Buyer's payment of the consideration provided hereunder, Sellers shall have received fair and reasonably equivalent value for the Purchased Assets.

"**Sale Procedures Order**" means an Order of the Bankruptcy Court, in substantially the form attached hereto as <u>Exhibit A</u> or as otherwise approved by Buyer, approving the sale procedures.

"**Second Lien Credit Agreement**" means the Loan and Security Agreement dated as of March 6, 2015, between Sellers and Second Lien Lender.

"**Second Lien Lender**" means Frozen Foods LLC.

"**Second Lien Obligations**" means the Obligations (as defined in the Second Lien Credit Agreement).

"**Sellers**" shall have the meaning set forth in the Preamble.

"**Seller Documents**" shall have the meaning set forth in <u>Section 5.1</u>.

"**Seller Marks**" has the meaning set forth in <u>Section 8.10</u>.

"**Seller Names**" has the meaning set forth in <u>Section 8.10</u>.

"**Software**" means, except to the extent generally available for purchase, subscription access or license from third Persons, any and all original (i) computer programs, including any and all software implementations of algorithms, models and methodologies (but excluding the output of any such program, such as a spreadsheet), whether in source code or object code, (ii) database applications and database management systems, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation including user manuals and other training documentation developed for the foregoing.

"**Tax Return**" means all returns, declarations, reports, estimates, claims for refund, information returns and statements required to be filed in respect of any Taxes, including any schedule or attachment thereto and any amendment thereof.

"**Taxes**" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, Inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, escheatment or unclaimed property, and estimated taxes, and together with all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in this clause (i), (ii) any liability for the payment of any amounts of any of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of such amounts was determined or taken into account with reference to the liability of any other Person, (iii) any liability for the payment of any amounts as a result of being a party to any tax sharing or allocation agreements or arrangements (whether or not written) or with respect to the payment of any amounts of any of the foregoing types as a result of any express or implied obligation to indemnify any other Person, and (iv) any liability for the payment of any of the foregoing types as a successor, transferee or otherwise.

"**Technology**" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business or in the design, development, reproduction, maintenance or modification of, any of the Products.

"**Termination Date**" shall have the meaning set forth in <u>Section 4.4(c)(vii)</u>.

"**Third Lien Credit Agreement**" means, collectively, (i) the Amended and Restated Term Loan and Security Agreement dated as of June 22, 2012 (as amended by Amendments Nos. 1-4 thereto) by and among Sellers and Third Lien Lender; and (ii) the Term Loan B and Security Agreement dated as of August 22, 2013, by and among Sellers and Third Lien Lender.

"**Third Lien Lenders**" means the Buyer, in its capacity as Lender under the Third Lien Credit Agreement.

"**Third Lien Obligations"** means all Obligations (as defined in the Third Lien Credit Agreement).

"**Trade Secrets**" shall have the meaning set forth in <u>Section 1.1</u> (in the definition of Intellectual Property).

"**Transfer Taxes**" means sales, use, stamp, documentary stamp, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with Sellers' transfer of the Purchased Assets to Buyer pursuant to this Agreement.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state Law related thereto.

Section 1.2    **Other Definitional and Interpretive Matters**.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    <u>Dollars</u>.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)    <u>Exhibits/Schedules</u>.  The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall not be deemed to have been disclosed on any other Schedule unless explicitly cross-referenced.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    <u>Gender and Number</u>.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    <u>Headings</u>.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

- 10 -

(vi)     <u>Herein</u>.  The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>," and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)     <u>Including</u>.  The word "including" or any variation thereof means "<u>including., without limitation</u>" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

**ARTICLE II**
**PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES**

Section 2.1     **Purchase and Sale of Assets**.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer the Purchased Assets. "**Purchased Assets**" shall mean all of Sellers' right, title and interest in, to and under the following assets of Sellers (but excluding Excluded Assets) as of or after the Closing:

(a)     all Accounts Receivable of Sellers, together with any unpaid financing charges or interest accrued thereon;

(b)     all cash, cash equivalents, bank deposits and similar cash items of Sellers, other than the Cash Payment;

(c)     all Inventory;

(d)     all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities or otherwise, but excluding deposits that are not transferable to Buyer) and other prepaid charges and expenses of Sellers;

(e)     all rights of Sellers (i) to any Real Property owned by Sellers set forth on <u>Schedule 1.1(b)</u> and (ii) under each Real Property Lease set forth on <u>Schedule 1.1(c)</u>, together with Sellers' interests in and to all improvements and fixtures on such Real Property and under each such Real Property Lease, and other appurtenances thereto, and Sellers' rights in respect thereof;

(f)     all Furniture and Equipment;

(g)     all Purchased Intellectual Property;

(h)     all Purchased Contracts;

- 11 -

(i)      all Documents of Sellers, including Documents relating to Accounts Receivable, Buyer Employees, Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property and all files, customer lists, files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (e) above, but excluding any Documents (A) exclusively relating to any Excluded Asset or (B) as set forth in Section 2.2(d);

(j)      all Permits to the extent transferrable, held by Sellers;

(k)      all supplies owned by Sellers;

(l)      all rights under insurance policies and rights to proceeds thereof relating to the Purchased Assets (other than any directors and officers or fiduciary insurance policy);

(m)      all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and agents of Sellers or with third parties;

(n)      all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors if and to the extent that such rights are assignable by operation of Law and to the extent affecting any Purchased Assets other than any warranties, representations and guarantees pertaining exclusively to any Excluded Assets;

(o)      subject to the provisions of Section 363(b)(1)(A) of the Bankruptcy Code, all goodwill and other intangible assets associated with the Business and/or the Purchased Assets, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property owned by Sellers;

(p)      any Claim, right or interest of Sellers in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom with respect to Taxes paid on or prior to the Closing Date;

(q)      all Claims and causes of action of Sellers, including any Claims and causes of action arising under Chapter 5 of the Bankruptcy Code or any other Law;

(r)      to the extent transferable, all prepaid Taxes and Tax credits of Sellers;

(s)      subject to the provisions of Section 363(b)(1)(A) of the Bankruptcy Code, all rights to the telephone and facsimile numbers and e-mail addresses used by Sellers, as well as rights to receive mail and other communications addressed to Sellers (including mail and communications from customers, suppliers, distributors and agents);

(t)      all other property and assets pertaining to or used or useful in the conduct of the Business or the ownership of the Purchased Assets, as set forth on Schedule 2.1(t), which may be amended by Buyer in its sole and absolute discretion to include any or all of Seller's employee benefits plans (including 401(k) plans) on or prior to the date that is five (5) days prior to the Closing; and

- 12 -

(u)    all other assets, properties, rights, Claims and causes of action of any Seller of any kind or nature whatsoever not otherwise described above but that are not expressly designated as Excluded Assets.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, amend the Purchased Assets so as to include additional assets in its sole and absolute discretion until two (2) Business Days prior to the Closing Date (except that Buyer may not add as a Purchased Asset anything specifically listed in Section 2.2 below as an Excluded Asset, other than Excluded Contracts); and provided, however, that no such addition shall result in any adjustment of the Purchase Price. Furthermore, Buyer may, from time to time, remove any Purchased Contract from Schedule 1.1(c) and/or any other Purchased Asset from this Section 2.1 in its sole and absolute discretion until two (2) Business Days prior to the Closing Date and elect to treat such Contract, Permit and/or other asset in accordance with Section 2.7(c) or as an Excluded Asset.

Section 2.2    **Excluded Assets**.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "**Excluded Assets**" shall mean all assets, properties, interests and rights of Sellers other than the Purchased Assets and Designation Rights Assets, including without limitation each of the following assets:

(a)    all Excluded Contracts;

(b)    all Liabilities, Indebtedness and other obligations, including any note Indebtedness, owed to or by any Seller to or by any Affiliate of any Seller, in all cases, other than Liabilities specifically identified as Assumed Liabilities pursuant to Section 2.4;

(c)    any Intellectual Property Right of Sellers other than the Purchased Intellectual Property;

(d)    any (i) confidential personnel and medical records pertaining to any Employee; (ii) other books and records that Sellers are required by Law to retain or that Sellers determine are necessary to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Buyer shall have, to the extent allowed by applicable Law, the right to make copies of any portions of such retained books and records that related to the Business or the Purchased Assets; (ii) minute books, stock or membership interest records and corporate seals; and (iii) documents relating to proposals to acquire the Business by Persons other than Buyer;

(e)    all of Sellers' rights under this Agreement and the other documents and agreements executed in connection with the transactions provided for herein, including, without limitation, Sellers' right to the Cash Payment;

(f)    the assets set forth on Schedule 2.2(f); and

(g)    any equity interests in any Seller.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, exclude any assets from the Purchased Assets and/or Designation Rights Assets in its sole and absolute discretion until three (3) Business Days prior to the Closing Date; provided, however, that after the Closing Buyer may declare any Contract to be an Excluded Contract if the Cure Amount for any such Contract is subject to dispute as of the Closing and is determined by the Bankruptcy Court after the Closing to be greater than the amount set forth in Schedule 2.4(e); provided, further, that no such exclusion or declaration shall result in any adjustment of the Purchase Price.

Section 2.3    **Excluded Liabilities**.    Notwithstanding anything contained in this Agreement to the contrary, Buyer will not assume or have any responsibility with respect to any Liability of Sellers (or any predecessor or Affiliate of Sellers) of any nature whatsoever not expressly included within the definition of Assumed Liabilities (collectively, the "**Excluded Liabilities**").  The Excluded Liabilities include, without limitation:

(a)    Taxes (i) imposed on any Seller for any period (including, for the avoidance of doubt, Transfer Taxes), or (ii) arising out of or related to the Business or the Purchased Assets for all Tax periods (or portions thereof) ending prior to the Closing;

(b)    any costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Cases, in each case, except as expressly set forth in Section 3.1(b);

(c)    Liabilities to the extent arising out of or related to the Excluded Assets;

(d)    Liabilities under any insurance policy;

(e)    Liabilities of Sellers under this Agreement or the Seller Documents;

(f)    all Liabilities which may become due or owing under the Purchased Contracts (i) with respect to the period prior to the Closing (other than the Cure Amounts) or (ii) after the Closing but which arise out of or relate to any breach that occurred prior to the Closing (other than the Cure Amounts);

(g)    any Employee Obligations to any Employee arising out of such Employee's employment by Sellers;

(h)    any Employee Claim of any Employee arising out of such Employee's employment by Sellers;

(i)    any WARN Act Liabilities arising on or prior to the Closing Date;

(j)    any Claim arising prior to Closing and not expressly assumed pursuant to this Agreement;

(k)    any Liability to any stockholder or other equity holder of any Seller or any predecessor of any Seller;

(l)    any Liability arising out of or related to any Legal Proceeding commenced or threatened against any Seller or any predecessor of any Seller;

(m)    any Liability for infringement or misappropriation of any intellectual property arising out of or related to any conduct of any Seller or operation of the Business on or before the Closing;

(n)    any Liability with respect to any Products produced, distributed or sold by the Sellers;

(o)    except for the costs pursuant to the Designation Rights Budget to the extent set forth in Section 2.7(c), any Liability of any Seller based upon any Seller's acts or omissions occurring before or after the Closing unless expressly assumed by Buyer; and

(p)    all other Liabilities and obligations for which Buyer does not expressly assume any liability, including without limitation any Liabilities listed on Schedule 5.9.

Section 2.4    **Assumed Liabilities**.  From and after the Closing Date, Buyer shall pay, perform and discharge, as and when due or as may otherwise be agreed between Buyer and the obligee, all of the Assumed Liabilities.  The "**Assumed Liabilities**" are specifically and exclusively as follows:

(a)    all Liabilities of Sellers set forth on Schedule 2.4(a);

(b)    all Liabilities under the Purchased Contracts accruing after the Closing;

(c)    all Liabilities (including all liens, security interests or other encumbrances associated therewith) constituting Second Lien Obligations, in each case, which shall be governed by the Second Lien Credit Agreement, as it may be amended,  from and after the Closing;

(d)    all costs pursuant to the Designation Rights Budget to the extent set forth in Section 2.7(c);

(e)    subject to Section 9.1(g), the Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts assumed and assigned to Buyer in accordance with this Agreement.  Sellers have provided to Buyer a schedule set forth on Schedule 2.4(e) setting forth a good faith estimate as of the date hereof of all Cure Amounts for all Purchased Contracts, which schedule the Sellers shall update on or prior to the date that is ten (10) days prior to the Closing Date; and

(f)    any Liabilities that the Buyer expressly agrees to assume in writing on or before the Closing.

Buyer's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Buyer as compared to the rights and remedies which such parties would have had against Sellers had this Agreement not been consummated.

Section 2.5 **Purchased Assets**. Subject to the provisions of (i) Section 2.2 regarding Buyer's right to declare a Contract to be an Excluded Contract if the Cure Amount for such Contract is greater than the amount set forth on Schedule 2.4(e), and (ii) Section 2.7(c) regarding the post-Closing time frame and procedure with respect to the Designation Rights Assets at Closing, and pursuant to Section 363 and Section 365 of the Bankruptcy Code, Sellers shall assume, assign and sell to Buyer and Buyer shall take an assignment or buy from Sellers, as the case may be, the Purchased Assets.

Section 2.6 **Further Conveyances and Assumptions**.

(a) From time to time following the Closing, Sellers and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, licensure and permit filings, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the Seller Documents and to assure fully to Sellers and their respective Affiliates and their respective successors and assigns, the payment of the Purchase Price, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(b) If following the Closing, the Sellers receive or become aware that they hold any property, right, Claim, demand or asset which constitutes a Purchased Asset then the Sellers shall transfer such property, right, Claim, demand or asset to the Buyer as promptly as practicable for no additional consideration.

(c) If following the Closing, the Buyer receives or becomes aware that it holds any property, right, Claim, demand or asset which constitutes an Excluded Asset, then the Buyer shall transfer such property, right, Claim, demand or asset to the Sellers as promptly as practicable for no additional consideration.

Section 2.7 **Transitional Matters**.

(a) From and after Closing, Sellers shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets.

(b) Buyer will use reasonable efforts to retain and make available, upon request, to Sellers and Sellers' successors, including, but not limited to, any liquidating trustee, until the earliest of (i) the closing of the Bankruptcy Cases; (ii) the date an Order is entered dismissing the Bankruptcy Cases, and (iii) two (2) years following the Closing Date, the Documents delivered by Sellers to Buyer, if reasonably needed by Sellers or Sellers' successors for liquidation, winding up, Tax reporting or other proper purposes; provided, that Sellers or Sellers' successors will use reasonable efforts to retain copies of Documents and the Parties otherwise will reasonably cooperate to minimize inconvenience to Buyer.

(c) Designation Rights.

(i)       During the Designation Rights Period, Sellers shall (A) not reject any Contract unless such Contract is expressly designated by Buyer in writing as an Excluded Contract or Buyer fails to pay amounts owed with respect to such Contract pursuant to the Designation Rights Budget in accordance with this Agreement (after having been afforded written notification and an opportunity to cure such failure in accordance with this Agreement) or unless otherwise agreed to in writing by Buyer and (B) hold all Permits and other assets specified by Buyer in writing in abeyance pending designation for assignment or exclusion by Buyer in accordance with this <u>Section 2.7(c)</u>.

(ii)       Any Contract not designated by Buyer in writing as either a Purchased Contract or an Excluded Contract, and any Permits and other assets designated in writing by Buyer, in each case at least two (2) Business Days prior to Closing, shall constitute a "**Designation Rights Asset**."  Buyer shall have the right, by written notice to Sellers within the Designation Rights Period, to specify that (A) any Designation Rights Asset that is a Contract shall be held by the Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code for the duration of the Designation Rights Period or earlier as provided in this <u>Section 2.7(c)</u>, and (B) any Designation Rights Asset that is not a Contract shall be held by Sellers in abeyance during the Designation Rights Period pending designation for assignment or exclusion by Buyer in accordance with this <u>Section 2.7(c)</u>.  With respect to any Designation Rights Asset, (i) Buyer shall be solely responsible for and directly pay for all costs associated with the continuation, operation or holding by Sellers of such Designation Rights Asset, (as set forth in a budget proposed by Sellers and approved by Buyer no later than ten (10) days prior to the Closing Date (such budget, the "**Designation Rights Budget**")), for the period from the Closing through fifteen (15) days after the earlier of (A) the end of the Designation Rights Period and (B) the date of Sellers' receipt of written notice from Buyer designating the assignment or exclusion of such Designation Rights Asset, (ii) for the avoidance of doubt, all consideration received by Sellers in respect of, and other benefits deriving from, such Designation Rights Asset (including Designation Rights Assets sold or assigned to third parties in accordance with subsection (c)(iii) below) shall be promptly delivered to Buyer, (iii) if such Designation Rights Asset is a Real Property Lease and if Buyer is granted access to and uses such property prior to designating such Real Property Lease as a Purchased Contract, Buyer shall purchase insurance (including liability and casualty policies) covering such real property consistent with Sellers' past practices and shall name Sellers as an additional party under such policies, and (iv) the foregoing shall not affect the validity of the transfer to Buyer of any other Purchased Asset whether or not related to such Designation Rights Asset.  In the event that the costs associated with any Designation Rights Asset exceed the Designation Rights Budget (a "**Designation Cost Overage**"), Buyer shall not be liable for such Designation Cost Overage, other than as a result of damage or destruction of any Real Property Lease or as a result of the Buyer's gross negligence or willful misconduct.

(iii)       As to each Designation Rights Asset, as soon as practical after receiving further written notice(s) (each, a "**Designation Notice**") from Buyer during the Designation Rights Period requesting assumption, assignment and sale of any Designation Rights Asset to Buyer or a third party, Sellers shall, subject to Buyer or such third party demonstrating adequate assurance of future performance thereunder and paying all Cure Amounts to the extent required by Section 365 of the Bankruptcy Code, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume, assign and sell to Buyer or such third

- 17 -

party the applicable Designation Rights Asset pursuant to Section 363 of the Bankruptcy Code and, if such Designation Rights Asset is a Contract, Section 365 of the Bankruptcy Code.

(iv)     Following fifteen (15) days after the earlier of (A) the end of the Designation Rights Period and (B) the date of Sellers' receipt of written notice from Buyer designating the exclusion of a Designation Rights Asset, a Designation Rights Asset shall be deemed to be an Excluded Asset for all purposes under this Agreement except with respect to Buyer's obligations to pay all amounts associated with such Designation Rights Asset as set forth on Schedule 2.4(a). For the avoidance of doubt, Buyer's obligations with respect to the costs and expenses of maintaining the Designation Rights Assets and the other obligations, including the obligation to maintain insurance, as provided in Section 2.7(c)(ii) hereof shall continue through the end of such period set forth in this Section 2.7(c)(iv).

(v)     Sellers and Buyer agree and acknowledge that the covenants set forth in this Section 2.7(c) shall survive the Closing.

(vi)     Notwithstanding anything in this Agreement to the contrary, on the date any Designation Rights Asset is assumed, assigned and sold to Buyer or its designee pursuant to this Section 2.7(c), such Designation Rights Asset shall be deemed a Purchased Asset for all purposes under this Agreement and no further consideration (except for the applicable Cure Amount with respect to Designation Rights Assets that are Contracts) shall be required to be paid for any Designation Rights Asset that is assumed, assigned and sold to Buyer or its designee.

(vii)     Sellers shall use reasonable best efforts to extend the deadline for assumption or rejection of any Designation Rights Asset that is a Real Property Lease for the maximum permitted period of time under Section 365 of the Bankruptcy Code.

(d)     Previously Omitted Contracts.

(i)     If prior to or following Closing it is discovered that a Contract should have been listed on Schedule 1.1(a) but was not listed on Schedule 1.1(a), (any such Contract, a "**Previously Omitted Contract**"), Sellers shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all proposed Cure Amounts (if any) for such Previously Omitted Contract. Buyer shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "**Previously Omitted Contract Designation**"). A Previously Omitted Contract designated in accordance with this Section 2.7(d)(i) as "Rejected," or with respect to which Buyer fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)     If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.7(d)(i), (A) Schedule 1.1(c) shall be amended to include such Previously Omitted Contract and (B) Sellers shall serve a notice (the "**Previously Omitted Contract Notice**") on the counterparties to such Previously Omitted Contract notifying such counterparties of the proposed Cure Amounts with respect to such Previously Omitted Contract

and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this <u>Section 2.7(d)</u> with no adjustment to the Purchase Price. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with seven (7) days to object, in writing to the Sellers and Buyer, to the Cure Amount and the assumption, assignment and sale of the Previously Omitted Contract. If the counterparties, Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Amounts and approve the assumption, assignment and sale. If no objection is timely served on Sellers and Buyer, Sellers shall obtain an Order of the Bankruptcy Court fixing the Cure Amounts and approving the assumption of the Previously Omitted Contract.

**ARTICLE III**
**CONSIDERATION**

Section 3.1    **Purchase Price**.

(a)    In consideration of the transfer of the Purchased Assets to Buyer and the other undertakings set forth herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall be:

(i)    the Cash Payment as set forth in Section 3.1(b); <u>plus</u>

(ii)    the assumption of the Assumed Liabilities including the Liabilities under the Second Lien Credit Agreement; <u>plus</u>

(iii)    Nine Million Dollars ($9,000,000) (the "**Credit Bid Amount**"), to be satisfied in the form of a credit against the Third Lien Obligations held by the Third Lien Lenders.

The Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts assumed at Closing, shall be paid by Buyer in addition to payment of the Purchase Price, and Sellers shall have no liability therefor. Notwithstanding anything to the contrary herein, under no circumstances shall any portion of the Credit Bid Amount be converted into or otherwise require a cash payment.

(b)    Buyer shall pay by wire transfer of immediately available funds on the Closing Date, an amount equal to the outstanding First Lien Obligations to the First Lien Lender in accordance with the First Lien Credit Agreement (the "**Cash Payment**").

**ARTICLE IV**
**CLOSING AND TERMINATION**

Section 4.1    **Closing Date**. Subject to the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "**Closing**") shall take place remotely via electronic communication (or at such other place as the Parties may designate

- 19 -

in writing) as soon as practicable following the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) and no later than a date that is three (3) Business Days after the Sale Order becomes a Final Order unless extended by Buyer in its sole discretion.  The date on which the Closing shall be held is referred to in this Agreement as the "**Closing Date**," and the Closing shall be deemed effective as of 11:59 PM on the day immediately preceding the Closing Date.

Section 4.2    **Deliveries by Sellers**.  At the Closing, Sellers shall deliver to Buyer:

(a)    a duly executed bill of sale and assignment;

(b)    a deed transferring the Real Property, if any, to Seller;

(c)    duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. trademark office, and general assignments of all other Purchased Intellectual Property;

(d)    a certificate of the Seller certifying as of the Closing Date to the matters set forth in Section 9.1(a), Section 9.1(b) and Section 9.1(e);

(e)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Purchased Assets to Buyer.

Section 4.3    **Deliveries by Buyer**.  At the Closing, Buyer shall deliver to Sellers:

(a)    the Purchase Price, including the Cash Payment, in immediately available funds, as provided in Section 3.1(b);

(b)    a certificate of a duly authorized officer of each Buyer certifying as of the Closing Date to the matters set forth in Section 9.2(a) and Section 9.2(b);

(c)    the evidence of a credit against the Third Lien Obligations of the Third Lien Lenders pursuant to Section 363(k) of the Bankruptcy Code equal to the Credit Bid Amount; and

(d)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Sellers, as may be necessary to convey the Purchased Assets to Buyer and for Buyer to assume the Assumed Liabilities.

Section 4.4    **Termination of Agreement**.  This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by Sellers or Buyer:

(i)        if any of the conditions set forth in <u>Section 9.3</u> shall have become incapable of fulfillment other than as a result of a breach by the Sellers or Buyer, as applicable, of any covenant or agreement contained in this Agreement, and such condition is not waived by the non-breaching party; or

(ii)        if there shall be in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c)        by Buyer:

(i)        if there shall be a material breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 9.1</u> or <u>Section 9.3</u> and which breach cannot be cured or has not been cured by the earlier of (A) ten (10) Business Days after the giving of written notice by Buyer to Sellers of such breach and (B) the Termination Date;

(ii)        in the event (A) the hearing on the motion to approve the Sale Procedures Order has not been completed on or before April 20, 2015, (B) the Bankruptcy Court has not entered the Sale Procedures Order on or before April 21, 2015, and/or (C) the Sale Procedures Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

(iii)        if (A) the hearing to approve the Sale Order has not concluded on or before May 21, 2015, (B) the Bankruptcy Court has not entered the Sale Order on or before May 29, 2015, and/or (C) the Sale Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

(iv)        **[Intentionally deleted]**

(v)        if, prior to the Closing, any Seller, the First Lien Lender and/or the Second Lien Lender seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the Bankruptcy Cases, or appoint a trustee in any Bankruptcy Case or appoint a responsible officer or an examiner with enlarged powers to operate the Business or dispose of assets relating to the operation of Sellers' businesses (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an Order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within fourteen (14) days after the entry thereof;

(vi)        if Sellers enter into and consummate an Alternative Transaction;

(vii)        if the Closing shall not have occurred on or before June 5, 2015 or such later date as determined by Buyer and Seller (the "**Termination Date**");

(viii)        if any of the conditions to the obligations of Buyer set forth in <u>Section 9.1</u> shall have become incapable of fulfillment other than as a result of a breach by Buyer

- 21 -

of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer; or

  (ix) if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and (A) Buyer has provided Sellers with written notice that it is prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing in Article IX have been satisfied (or waived, to the extent permissible, by the Party entitled to the benefit of such condition), other than those conditions that by their nature can only be satisfied at Closing) and (C) the Closing date does not occur within five (5) Business Days of Buyer providing Sellers with such notice.

  (d) by Sellers:

  (i) if any condition to the obligations of Sellers set forth in <u>Section 9.2</u> shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

  (ii) if there shall be a material breach by Buyer of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 9.2</u> or <u>Section 9.3</u> and which breach cannot be cured or has not been cured by the earlier of (A) ten (10) Business Days after the giving of written notice by Sellers to Buyer of such breach and (B) the Termination Date;

  (iii) if the Closing shall not have occurred on or before the Termination Date; <u>provided</u>, <u>however</u>, that if the Closing shall not have occurred on or before the Termination Date due to a breach of any of the representations, warranties, covenants or agreements contained in this Agreement by the Sellers, which would give the Buyer a right not to close pursuant to <u>Article IX</u>, then the Sellers may not terminate this Agreement pursuant to this <u>Section 4.4(d)(iii)</u>;

  (iv) **[Intentionally deleted]**

  (v) if Sellers enter into an Alternative Transaction.

  Section 4.5 <u>**Effect of Termination; Payment of Break-Up Fee & Expense Reimbursement**</u>.  In the event the Sellers terminate this Agreement in accordance with Section 4.4 for any reason other than the Buyer being in breach of this Agreement, (A) Sellers will pay Buyer a break-up fee in the amount of Three Hundred Twenty Five Thousand Dollars ($325,000) (the "Break-Up Fee") and (B) Sellers will reimburse the Buyer for any and all fees and expenses (including expenses of counsel, accountants and financial advisors) incurred by the Buyer in connection with or related to the transactions contemplated by this Agreement, up to an aggregate amount of $125,000 (the "Expense Reimbursement").  The Break-Up Fee and Expense Reimbursement shall be super-priority administrative expenses of each of the Sellers' estates with priority over any all claims against the Sellers' estate except for super-priority administrative expenses granted to lenders to the Sellers pursuant to Section 364 of the Bankruptcy Code and shall be payable by the Sellers out of the proceeds of the sale at closing of the sale of the Business or the Assets, whether pursuant to an Alternative Transaction or otherwise.

Section 4.6    **Other Effects of Termination**.   In the event that this Agreement is validly terminated in accordance with Section 4.4, this Agreement shall terminate and each of the Parties shall be relieved of its respective duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Sellers; provided, however, that the obligations of the Sellers set forth in Section 4.5 and the obligations of the Parties set forth in Article XII hereof shall survive any such termination and shall be enforceable hereunder.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Sellers hereby jointly and severally represent and warrant to Buyer that:

Section 5.1    **Authorization of Agreement**.   Subject to the entry of the Sale Order: (a) each Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and each Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement (the "**Seller Documents**"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; and (b) this Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against each Seller in accordance with their respective terms.

Section 5.2    **No Conflicts**.

(a)    Except as set forth on Schedule 5.2(a), none of the execution and delivery by any Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will result in the creation of any Lien upon the Purchased Assets, or conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of any Seller; (ii) subject to entry of the Sale Order, any Contract or Permit to which any Seller is a party or by which any of the properties or assets of any Seller are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to any Seller or any of the properties or assets of any Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), and such other conflicts, violations, defaults, terminations, modifications, accelerations or cancellations that would not have, or reasonably be expected to have, a Material Adverse Effect on the ownership and operation of the Business.

(b)    Subject to entry of the Sale Order, and except as set forth on Schedule 5.2(b), no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing

with, or notification to any Person or Governmental Body is required on the part of any Seller in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by any Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by such Seller of any other action contemplated hereby or thereby, except for such consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not have a Material Adverse Effect on the ownership and operation of the Business.

Section 5.3 **Title to Purchased Assets**.  Other than the real property subject to the Real Property Leases and the personal property subject to the Personal Property Leases, Sellers have good title to the Purchased Assets and, at the Closing, the Sellers, pursuant to the Sale Order, shall transfer good title in, to and under (subject to the Purchased Contracts (other than Purchased Contracts assumed or assigned post-Closing) being assumed and assigned in accordance with Section 2.1) all of such Purchased Assets, in each case free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  The Purchased Assets constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used or held for use by Sellers in connection with operating, in all material respects, the Business in the ordinary course, or otherwise necessary for Buyer to conduct and operate, in all material respects, the Business in the ordinary course immediately after the Closing.  No Person other than Sellers are engaged in the operation of, or hold rights, title and interest in, the Purchased Assets or assets that are used or useful in the operation of the Business.

Section 5.4 **Real Property**.  Schedule 1.1(b) sets forth a complete list of all real property owned by Sellers ("**Real Property**").  Schedule 1.1(c) sets forth a complete list of all real property and interests in real property leased by Sellers (individually, a "**Real Property Lease**" and collectively, the "**Real Property Leases**") as lessee or lessor in connection with the Business and which are part of the Purchased Assets.  Seller has good and marketable title to the Real Property, free and clear of all Liens of any nature whatsoever except Permitted Exceptions. Sellers have a valid and enforceable leasehold interest under each Real Property Lease under which it is a lessee, free and clear of all Liens of any nature whatsoever except Permitted Exceptions.

Section 5.5 **Tangible Personal Property**.  Schedule 1.1(a) sets forth all leases of personal property ("**Personal Property Leases**") relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.  Each Seller has a valid and enforceable leasehold interest under each Personal Property Lease under which it is a lessee.

Section 5.6 **Intellectual Property**.  Schedule 1.1(d) sets forth an accurate and complete list of all Intellectual Property.  Sellers own all right, title and interest to, or are licensees with respect to, the Purchased Intellectual Property, and, except to the extent expressly prohibited by Section 365 of the Bankruptcy Code, can convey such property free and clear of Liens (other than Permitted Exceptions) pursuant to the Sale Order.  To the knowledge of Sellers, (i) no Person is engaging in any activity that infringes any Purchased Intellectual Property and (ii) no Claim has been asserted in writing to any Seller that the use of any Purchased Intellectual Property or the operation of the Business infringes or violates the

- 24 -

Intellectual Property of any third party. The Purchased Intellectual Property and the rights under the Purchased Contracts include the rights to use all Intellectual Property required to operate the Business as currently conducted.

Section 5.7 **Financial Statements**. Each of the financial statements has been prepared in accordance with GAAP consistently applied without modification of the accounting principles used in the preparation thereof throughout the periods presented and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Sellers as of the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements. Other than with respect to Excluded Liabilities as to which the Sellers do not provide any representations and warranties, no Seller has any material Liabilities that would be required by GAAP to be reflected on a consolidated balance sheet (or the notes thereto) of the Company and its Subsidiaries, except for liabilities and obligations (a) reflected or reserved against in the Company's consolidated balance sheet (or the notes thereto) included in the financial statements, (b) incurred in the Ordinary Course of Business since the date of the latest balance sheet, (c) which have been discharged or paid in full prior to the date of this Agreement, or (d) incurred pursuant to the transactions contemplated by this Agreement. Since the date of the Company's latest balance sheet, to the knowledge of Sellers, no Seller has received any complaint, allegation, assertion or Claim regarding the accounting or auditing practices, procedures, methodologies or methods of Sellers or their respective internal accounting controls.

Section 5.8 **Financial Advisors**. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Buyer or Sellers in respect thereof, in each case other than as set forth on Schedule 5.8 (which shall include the amount of any such fee or commission or like payment).

Section 5.9 **Litigation**. Except as set forth on Schedule 5.9 and other than in connection with the Bankruptcy Cases, there is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the Sellers' knowledge, threatened against or relating to any Seller or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might materially and adversely affect the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby.

Section 5.10 **Compliance with Laws**. Except as set forth on Schedule 5.10, Sellers have conducted and are presently conducting the Business in compliance with all material applicable Laws in all material respects.

Section 5.11 **Permits**. Schedule 5.11 sets forth all material Permits used by Sellers in the Business. Sellers are in compliance with the material terms of all such Permits, except where such non-compliance would not be material to the ownership and operation of the Business and to Seller's knowledge, all such Permits are valid and in full force and effect, and no Legal Proceeding is pending or, to the knowledge of Sellers, threatened, the object of which is to revoke, limit or otherwise affect any such Permit

- 25 -

Section 5.12   **Purchased Inventory**.

(a)     No Purchased Inventory is materially damaged in any significant way, except for any such damage which would not be material to the Purchased Inventory taken as a whole;

(b)     None of the Purchased Inventory has been part of a current or past product recall, except for any such recall which would not be material to the Purchased Inventory taken as a whole;

(c)     The Purchased Inventory is in material compliance with United States federal guidelines for such products as of the date hereof, except for any such non compliance which would not be material to the Purchased Inventory taken as a whole; and

(d)     The Purchased Inventory is in working condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the case may be, except for such failure to be in such condition which would not have a Material Adverse Effect on the Purchased Inventory taken as a whole.

Section 5.13   **Contracts**.   Schedule 1.1(a) contains a complete list of all Contracts, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement and which are necessary for the conduct of the Business.   Except as set forth in Schedule 1.1(a), no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract.   Sellers have not, and, to Sellers' knowledge, no other party to any Purchased Contract has, commenced any action against any of the parties to any Purchased Contract or given or received any written notice of any default or violation under any Purchased Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts.   Each Purchased Contract is, or will be upon the Closing and payment of any applicable Cure Amount, valid, binding and in full force and effect in accordance with its terms.

Section 5.14   **Taxes**.   Except as such payment or any enforcement action is stayed as a result of the Bankruptcy Case:

(a)     All Tax Returns required to have been filed by Sellers have been duly filed, all such Tax Returns are true, correct and complete in all material respects, and all Taxes required to be paid have been paid;

(b)     No federal or state income Tax Return audits are pending with respect to any Seller, except for those set forth on Schedule 5.14;

(c)     No Seller has received written notice from any Governmental Body of future federal or state income Tax Return audits;

(d)     There are no material liens with respect to Taxes upon any of the Purchased Assets, other than Liens for Taxes not yet due and payable; and

(e)    No Seller has (i) waived any statute of limitations in respect of any Tax Returns that have not been filed as of the date hereof or (ii) agreed to any extension of time with respect to the assessment of Taxes for which such Taxes have not been paid as of the date hereof.

Section 5.15    **Labor Matters**.  No Seller is a party to any labor or collective bargaining agreement or workplace rules with respect to its Employees.  No Employee of any Seller is represented by any labor organization and no labor organization or group of Employees of any Seller has made a pending demand for recognition or request for certification.  There are no representation or certification proceedings or petitions seeking a representation election presently pending or, to the knowledge of Sellers, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller.

Section 5.16    **Designation Rights Budget**.  The Designation Rights Budget will be prepared on a reasonable basis and in good faith and is based on assumptions believed by Sellers to be reasonable at the time made.

Section 5.17    **No Other Agreements to Purchase**.  Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option purchase or acquire from Sellers any Purchased Asset, other than purchase orders for Inventory accepted by Sellers in the Ordinary Course of Business.

Section 5.18    **No Other Buyer Representations**.  Notwithstanding anything contained in this Agreement to the contrary, Sellers acknowledge and agree that Buyer and each of its directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other representatives are not making any representation or warranty whatsoever, express or implied, beyond those expressly given by Buyer in Article VI hereof (as modified by the Schedules hereto).

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that:

Section 6.1    **Organization and Good Standing**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

Section 6.2    **Authorization of Agreement**.  Buyer has full limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Buyer in connection with the consummation of the transactions contemplated hereby and thereby and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Buyer of this Agreement and each Buyer Document have been duly authorized by all necessary action on behalf of Buyer.  This Agreement has been, and each Buyer Document will be at or prior to the Closing, duly executed and delivered by Buyer, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Buyer Document when so executed and delivered will constitute, legal, valid and binding obligations of Buyer, enforceable against Buyer, in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and

similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3    **Financial Advisors**.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the transactions contemplated by this Agreement and no person is entitled to any fee or commission or like payment in respect thereof.

Section 6.4    **No Conflicts**.  None of the execution and delivery by Buyer of this Agreement or any of the other documents to be executed by the Buyer in connection herewith, the consummation of the transactions contemplated hereby or thereby, or compliance by the Buyer with any of the provisions hereof or thereof will result in the conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provision of the certificate of incorporation and by-laws or comparable organizational documents of Buyer except as would not have a material and adverse effect on the ability of Buyer to consummate the transactions contemplated hereby and fulfill its obligations hereunder.

Section 6.5    **Litigation**.  There is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of Buyer's knowledge, threatened against or relating to Buyer or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might materially and adversely affect the ability of Buyer to enter into this Agreement or to consummate the transactions contemplated hereby.

Section 6.6    **Condition of the Business**.  Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Sellers and each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other representatives are not making any representation or warranty whatsoever, express or implied, beyond those expressly given by Sellers in Article V hereof (as modified by the Schedules hereto), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis.

Section 6.7    **Disclaimer Regarding Projections**.  Buyer may be in possession of certain projections, plans and other forecasts regarding Seller.  Buyer acknowledges that there are substantial uncertainties inherent in attempting to make such projections, plans and other forecasts, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, plans and other forecasts so furnished to it, and that Buyer shall have no claim against anyone with respect thereto.  Accordingly, Buyer acknowledges that, without limiting the generality of this Section, neither Seller nor any of its Affiliates has made any representation or warranty with respect to such projections and other forecasts and plans.

## ARTICLE VII
## BANKRUPTCY COURT APPROVAL/ MATTERS

Section 7.1    **Bankruptcy Court Filings.**

(a)    The Sellers and the Buyer acknowledge that this Agreement and the transactions contemplated hereby are subject to the approval of the Bankruptcy Court.

(b)    The Sellers shall use their best efforts to obtain entry of the Sale Procedures Order by April 14, 2015.  The Sale Procedures Order, must (i) be in form and substance acceptable to the Buyer in its sole and absolute discretion, (ii) approve the Buyer as the stalking horse bidder, (iii) approve the Break-Up Fee and Expense Reimbursement and the other bidder protections, and (iv) schedule the hearing to consider entry of an order approving the sale of the assets to the successful bidder under the Sale Procedures Order.  The Sellers shall use their best efforts to obtain entry of the Sale Order by May 20, 2015.  The Sale Order must be in form and substance acceptable to the Buyer, in its sole and absolute discretion.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining the Sale Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code.  Sellers shall consult with Buyer and its representatives concerning any Order of the Bankruptcy Court relating to this Agreement and the Bankruptcy Cases and provide Buyer with copies of applications, pleadings, notices, proposed Orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.  If any Order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such Order), Sellers shall promptly notify the Buyer, shall promptly provide Buyer with copies, shall diligently defend against such appeal, petition or motion, and shall use its reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion; provided, that Sellers shall consult with Buyer regarding the status of any such actions.  Any material changes to the form of the Sale Procedures Order or the Sale Order must be approved by Buyer.

(c)    No Seller shall take any action that is intended to or does result in, or fail to take any action the intent of which failure to act would or does result in, the reversal, voiding, modification, or staying of the Sale Order.

(d)    Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

(e)    If an Auction is conducted, the Buyer may participate in the Auction and submit one or more subsequent bids in accordance with the Bidding Procedures.

(f)    The Sellers shall waive any right to pursue claims or causes of action arising under chapter 5 of the Bankruptcy Code on and after the Closing, as such actions are among the Assets being purchased by the Buyer under this Agreement. After Closing, Buyer shall be free to pursue claims or causes of action arising under chapter 5 of the Bankruptcy Code in its sole discretion.

Section 7.2    **Break-Up Fee and Buyer Expense Reimbursement**.  Pursuant to the terms and conditions set forth in the Sale Procedures Order, the Sellers agree to pay Buyer the Break-Up Fee and the Expenses Reimbursement in accordance with Section 4.5.

## ARTICLE VIII
## COVENANTS

Section 8.1    **Access to Information**.  Sellers agree that, prior to the Closing Date, Buyer shall be entitled, through its officers, employees and representatives (including their respective legal advisors and accountants), to make such reasonable investigation and inspection of any and all properties, businesses and operations of Sellers and the Business and such examination of the books, records and financial condition of Sellers, the Business, the Purchased Assets and the Assumed Liabilities as they reasonably request and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law.  Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's representatives in connection with such investigation and examination, and Buyer and its representatives shall cooperate with Sellers and their respective representatives and shall use their reasonable efforts to minimize any disruption to the Business.

Section 8.2    **Further Assurances**.  Each of Sellers and Buyer shall use commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement on or prior to the Termination Date (as may be extended by the Buyer) and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

Section 8.3    **Confidentiality**.  Following the Closing, Sellers agree to maintain, and shall cause their respective Affiliates to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective Affiliate's possession or of which Sellers or any of their respective Affiliates are aware.  Sellers hereby further agree, unless disclosure is required by applicable Law, to take all appropriate steps, consistent with Sellers' past practice, and to cause each of their respective Affiliates to take all appropriate steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure, misuse, espionage, loss and theft.  In furtherance and not in limitation of the foregoing, following the Closing, Sellers shall not, and shall cause their respective Affiliates not to, unless required by applicable Law, disclose to any Person (i) any confidential information regarding the Business, provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 8.3 or information not otherwise known by the Sellers that becomes available to any Seller from a Person other than

Buyer, a current or former employee of any Seller, or a Person known by any Seller to be bound by an obligation of confidentiality to any Seller, or (ii) any of the discussions or negotiations conducted with Buyer in connection with this Agreement, provided, that Sellers shall be entitled to disclose (A) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee or parties in interest in the Bankruptcy Cases, (B) any information required to be disclosed by Sellers pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), Legal Proceeding or Governmental Authority, or (C) any information to Sellers' counsel and financial advisor; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required. Notwithstanding anything in this Section 8.3 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any Trade Secrets of the Business or Buyer shall be maintained for so long as such Trade Secrets continue to be entitled to protection as Trade Secrets of the Business and Buyer, respectively.

Section 8.4    **Preservation of Records**.    Sellers (or any subsequently appointed bankruptcy estate representative, including, but not limited to, a trustee, a creditor trustee or a plan administrator) and Buyer agree that each of them shall preserve and keep the books and records held by it or their respective Affiliates relating to the pre-Closing Business for a period of twelve (12) months from the Closing Date and shall make such books and records available to the other parties (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of Sellers or Buyer or any of their Affiliates or in order to enable Sellers or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.    In the event Sellers, on the one hand, or Buyer, on the other hand, wish to destroy such records during such twelve (12) month period, such Party shall first give twenty (20) days' prior written notice to the other and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within that twenty (20) day period, to take possession of the records within thirty (30) days after the date of such notice.

Section 8.5    **Operation of Business**.    Until the Closing, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, to operate the Business in the Ordinary Course of Business and in accordance with the Approved Budget.    Sellers shall use commercially reasonable efforts to (A) preserve intact their respective business organizations, (B) maintain the Business and the Purchased Assets (normal wear and tear excepted), (C) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers and others having business relationships with Sellers in connection with the operation of the Business (other than effects on such relationships as may result from the non-payment of pre-petition Claims), (D) pay all of their respective post-petition obligations in the Ordinary Course of Business to the extent authorized in the Approved Budget, and (E) continue to operate the Business in all material respects in compliance with all Laws applicable to the Business and Sellers.    Without limiting the generality of the foregoing, and except (i) as otherwise expressly provided in or contemplated by this Agreement, or (ii) required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, on or prior to the Closing Date, Sellers may not, without the prior written consent of Buyer (not to be

unreasonably withheld, conditioned or delayed), take any of the following actions with respect to the Business:

(a)    (i) modify in any material manner the compensation of any of the directors, Employees, or officers, or accelerate the payment of any such compensation (other than in the Ordinary Course of Business), (ii) grant, other than year-end bonuses in the Ordinary Course of Business, any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any director, Employee or officer, or (iii) change the title, authority or duties of any director, Employee or officer;

(b)    engage any new Employee other than in the Ordinary Course of Business, provided, however, that Sellers shall not engage any new Employee whose aggregate annual compensation exceeds $50,000;

(c)    remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory (other than the sale of Inventory in the Ordinary Course of Business);

(d)    sell, lease or otherwise dispose of, mortgage, hypothecate or otherwise encumber any Purchased Asset (other than sales of Inventory in the Ordinary Course of Business and other than any Liens provided for in the DIP Order);

(e)    reject, amend, terminate or renew any (i) Purchased Contract or Designation Rights Asset that is a Contract (other than any Real Property Lease), or (ii) Real Property Lease;

(f)    fail to use commercially reasonable efforts to maintain the validity of Sellers' rights in, to or under any Purchased Intellectual Property;

(g)    fail to use commercially reasonable efforts to maintain all Permits of Sellers, including those used in the operation of the Business;

(h)    make any unusual or extraordinary efforts to collect any outstanding Accounts Receivable or intercompany obligation, liability or Indebtedness, give any discounts or concessions for early payment of such Accounts Receivable or intercompany obligation, liability or Indebtedness, other than the usual discounts given by the Business in the Ordinary Course of Business and make any sales of, or, other than Liens provided for in the DIP Order, convey any interest in, any Accounts Receivable or intercompany obligation, liability or Indebtedness to any third party;

(i)    other than transactions pursuant to agreements or arrangements in effect on the Petition Date as set forth on Schedule 8.5(i), engage in any transaction with any Affiliate (other than the other Sellers), shareholder, officer or director of any Seller (other than in the Ordinary Course of Business), incur or assume any long term or short term debt with or on behalf of any such Person or guarantee, endorse or otherwise be liable or responsible (whether directly, indirectly, contingently or otherwise) for the obligations of any such Person, for the sake of clarity, the Sellers may continue to enter into transactions in the Ordinary Course of

Business (except as required in connection with the Bankruptcy Cases) with other Sellers prior to the closing of the transactions contemplated hereby;

   (j) make any change in their method of accounting, except in accordance with GAAP;

   (k) enter into any Contract that would survive the Closing (other than in the Ordinary Course of Business and provided that the term of such Contract does not exceed one (1) year, other than with respect to an Alternative Transaction, subject to compliance with Section 7.2 hereof, prior to the entry of the Sale Order);

   (l) return Inventory with an aggregate value of more than $5,000 to any single vendor unless defective;

   (m) fail to maintain any insurance policy in effect on the date hereof or amend any such policy other than in the Ordinary Course of Business;

   (n) accelerate the payment of any obligation, Liability or Indebtedness of any Seller;

   (o) subject any of the Purchased Assets to any Lien, except for Permitted Exceptions or any Liens created consistent with the DIP Financing;

   (p) acquire any material properties or assets or sell, assign, license, transfer, convey, lease or otherwise dispose of any material properties or assets (except pursuant to an existing Contract for fair consideration in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets);

   (q) compromise, settle or agree to settle any pending or threatened action, suit or Legal Proceeding, or consent to the same, other than compromises, settlements or agreements that involve only the payment of money damages; and

   (r) agree, whether in writing or otherwise, to do any of the foregoing.

Nothing contained in this Agreement shall (i) give Buyer, directly or indirectly, the right to control or direct Sellers' operations prior to the Closing, (ii) give Sellers, directly or indirectly, the right to control or direct Buyer's operations prior to the Closing and (iii) prohibit Sellers from paying any and all 503(b)(9) Claims, Claims which if unpaid would result in a mechanics lien and/or Claims related to the Perishable Agricultural Commodities Act (PACA), all only as authorized by a Bankruptcy Court Order and only to the extent permitted to be paid pursuant to the Approved Budget.  Prior to the Closing, each of Sellers and Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

  Section 8.6 **Section 363(b)(1)(A)**.  Buyer shall honor and observe any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

Section 8.7    **Adequate Assurances Regarding Purchased Contracts and Certain Real Property Leases**.  With respect to each Purchased Contract and Real Property Lease set forth on Schedule 1.1(c), Buyer shall provide adequate assurance of the future performance of such Purchased Contract and Real Property Lease by Buyer as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable.

Section 8.8    **Notification of Certain Matters**.  Sellers, on the one hand, and Buyer on the other hand, shall each promptly inform the other in writing of the occurrence of any event or circumstance that has prevented or is reasonably expected to prevent any Party from fulfilling the conditions to closing set forth in Article 9.

Section 8.9    **Prospective Employees**.

(a)    Sellers shall reasonably assist Buyer to engage, in Buyer's sole and absolute discretion, the services of Sellers' Employees currently engaged in staffing the Business ("**Prospective Employees**"), on terms and conditions satisfactory to Buyer and such Prospective Employees.  Sellers shall not, and shall not attempt to, engage or transfer the services of any of the Prospective Employees to any other business operated by Sellers or their successors; provided, however, that in the event Buyer engages and then later terminates the services of any Prospective Employee, Sellers may later re-engage the services of such individuals.  Buyer shall be provided access to, and be allowed to communicate with, such Prospective Employees.  Buyer shall, following consultation with Sellers, identify the names of the Prospective Employees whose services it wishes to engage at least five (5) days prior to the Closing Date (including with respect to all Prospective Employees associated with all Designation Rights Assets).  Such individuals (including individuals associated with Designation Rights Assets) who accept such offer or otherwise continue employment with Buyer are hereinafter referred to as the "**Buyer Employees**."

(b)    Buyer shall, in consultation with Sellers, be provided access to, and be allowed to communicate with, the Prospective Employees.  Sellers shall, subject to restrictions imposed by the Bankruptcy Code, as such may be modified by order of the Bankruptcy Court, be responsible for payment of all compensation due to Prospective Employees with respect to the period prior to the Closing Date, including, but not limited to any unpaid wages, salary, health benefits, severance, WARN Act Liability, or change of control obligations.

(c)    Nothing herein expressed or implied is intended to confer on any Person other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Section 8.10.

(d)    Nothing contained in this Section 8.10 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Buyer Employee or any change in the employee benefits available to any individual Buyer Employee.  Nothing herein shall obligate Buyer to employ any Buyer Employee for any particular length of time following the Closing Date.

Section 8.10    **Name Change**.  Within twenty-one (21) days after the Closing, Sellers shall take all steps necessary to effect a change in their respective corporate names to remove the

- 34 -

words "Gourmet", "Gourmet Express" and any other names utilized by Sellers in the Business (collectively, the "**Seller Names**") from such names.  Sellers agree that they shall (i) as promptly as practicable after the Closing Date and in any event within fourteen (14) days following the Closing Date, cease to make any use of the Seller Names or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or any of the Purchased Intellectual Property or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "**Seller Marks**"), and (ii) immediately after the Closing, cease to hold themselves out as having any affiliation with the Business.  As promptly as practicable, Sellers shall remove, strike over, cover, block or substantially obliterate all Seller Marks from any vehicles, displays, signs, promotional materials or other similar materials then owned by them.  Sellers shall not file a motion in the Bankruptcy Court to convert the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code after the Closing until they have complied in full with their obligations set forth in this Agreement and have provided fourteen (14) days' written notice to Buyer.

Section 8.11    **Certain Financing Matters**.  In order to assist with the consummation and effectiveness of the DIP Financing and any other financing necessary to consummate the transactions contemplated in this Agreement, Sellers shall request that their respective consultants, advisors and auditors provide such cooperation as Buyer may reasonably request in connection therewith.

## ARTICLE IX
## CONDITIONS TO CLOSING

Section 9.1    **Conditions Precedent to Obligations of Buyer**.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of Sellers set forth in this Agreement qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects at and as of the Closing, except, in all cases, to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects, on and as of such earlier date) and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(b)    Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(c)    Sellers shall have delivered, or caused to be delivered, to Buyer all of the items set forth in Section 4.2;

- 35 -

(d)     Buyer shall have obtained all material Permits reasonably necessary to operate the Business, or as to any material Permits necessary to operate the Business that have not been obtained, such Permits shall be in full force and effect as Designation Rights Assets pursuant to Section 2.7(c)(viii);

(e)     From the date hereof through the Closing Date, (i) there shall have been no Material Adverse Effect and (ii) the Sellers shall have delivered to Buyer a certificate, dated as of the Closing Date, to such effect;

(f)     The Purchased Assets shall be assumed, assigned and sold to Buyer, as the case may be, by Order of the Bankruptcy Court satisfactory to Buyer in its sole and absolute discretion;

(g)     the aggregate Cure Amounts as determined by the Bankruptcy Court shall not be more than 120% of the aggregate Cure Amounts set forth on Schedule 2.4(e)as of the date hereof, unless otherwise agreed in writing by Buyer in its sole and absolute discretion;

(h)     Buyer shall have received the Second Lien Credit Agreement and related documents (including but not limited to (A) notes evidencing the loans under the Second Lien Credit Agreement, (B) collateral security documents, (C) letter of credit documents, and (D) an intercreditor agreement) consistent in all material respects with this Agreement and otherwise in form and substance acceptable to Buyer,

(i)     The Sale Procedures Order shall have become a Final Order (unless this condition shall have been waived in writing by Buyer); and

(j)     The Sale Order shall have become a Final Order (unless this condition shall have been waived in writing by Buyer).

Section 9.2     **Conditions Precedent to Obligations of Sellers**.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     The representations and warranties of Buyer set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except, in all cases, (i) to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materially shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and (ii) to the extent that any inaccuracy in such representations and warranties, individually or in the aggregate would not reasonably be expected to materially and adversely affect Buyer's ability to consummate the transactions contemplated by this Agreement; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect;

(b)     Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by

Buyer on or prior to the Closing Date; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect;

(c)     Buyer shall have delivered, or caused to be delivered, to Sellers the Purchase Price in accordance with <u>Section 3.1</u>; and

(d)     Buyer shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 4.3</u>.

Section 9.3     **<u>Conditions Precedent to Obligations of Buyer and Sellers</u>**.     The respective obligations of Buyer and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of the following conditions (which may be waived by Buyer and Sellers in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

Section 9.4     **<u>Frustration of Closing Conditions</u>**.  Neither Sellers nor Buyer may rely on the failure of any condition set forth in Section 9.1, Section 9.2 or Section 9.3, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

**ARTICLE X**
**<u>NO SURVIVAL</u>**

Section 10.1     **<u>No Survival of Representations and Warranties</u>**.  The Parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof.  The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

**ARTICLE XI**
**<u>TAX MATTERS</u>**

Section 11.1     **<u>Transfer Taxes</u>**.  Sellers shall be responsible for all Transfer Taxes.

Section 11.2     **<u>Proration</u>**.  All real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Sellers and Buyer as of 12:01 a.m. (New York time) on the day following the Closing Date.  If the exact amount of any real or personal property Taxes is not known on the Closing Date, the apportionment shall be based upon a reasonable amount, without subsequent adjustment.

Section 11.3   **Purchase Price Allocation**.  Within sixty (60) days following the Closing, Buyer shall deliver to Sellers a proposed allocation of the Purchase Price (including the Assumed Liabilities and any other amounts properly included therein) among the Purchased Assets in accordance with Section 1060 of the Code and Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as applicable).  Sellers shall have thirty (30) days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith.  Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule (the "**Final Allocation**").  Sellers and Buyer agree to cooperate with each other in preparing IRS Form 8594 (including any subsequent adjustments required thereto) in a manner consistent with such Final Allocation, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.  If such Final Allocation is disputed by any Tax authority or other Governmental Body, Buyer or any Seller receiving notice of such dispute will promptly notify the other Party and the Parties will use their reasonable best efforts to sustain the Final Allocation.  Neither Buyer nor Sellers shall take any position (including in any Tax Returns, reports, audits or otherwise) that is inconsistent with such allocation, unless otherwise required pursuant to a final determination by a court of competent jurisdiction or pursuant to a closing agreement with the IRS entered into pursuant to Section 7121 of the Code.  The Purchase Price allocation determined in connection with this Section 11.3 shall be utilized for Tax reporting purposes only.  For the avoidance of doubt, such allocation shall not be binding upon any Party for purposes other than Tax reporting or used as evidence, or for any other purpose, in connection with any dispute regarding valuation or allocation of the Purchase Price and/or Assumed Liabilities.  This Section 11.3 shall survive the Closing Date.

**ARTICLE XII**
**MISCELLANEOUS**

Section 12.1   **Expenses**.  Except for Transfer Taxes (which shall be governed by Section 11.1), and except for the Expense Reimbursement in connection with a Termination by Sellers pursuant to Section 4.5, each of Sellers and Buyer shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 12.2   **Submission to Jurisdiction; Consent to Service of Process**.

(a)   Without limiting any Party's right to appeal any order of the Bankruptcy Court, (1) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.6 hereof; provided, however, that if the Bankruptcy Cases have closed or the Bankruptcy Court refuses to exercise jurisdiction, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Maryland and any appellate court thereof, for the resolution of any such Claim or dispute.  The Parties hereby

irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 12.6</u>.

Section 12.3    **Waiver of Right to Trial by Jury**.  Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

Section 12.4    **Entire Agreement; Amendments and Waivers**.  This Agreement (including the Schedules and Exhibits hereto) represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought or, if such amendment, supplement, modification or waiver can be so construed, by both Parties.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.5    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in the State of Delaware.

Section 12.6    **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or electronic mail (and no notice of failure of delivery was received within a reasonable time after such message was sent) or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers and e-mail addresses (or to such other address, facsimile number or e-mail address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Sellers, to:

      Gourmet Express, LLC

      _____

      _____

      Attention: _____

      Facsimile: _____

      Email: _____

      with a copy to (which shall not constitute notice):

      Whiteford Taylor Preston LLC
      Renaissance Centre
      405 King Street
      Suite 500
      Wilmington, DE 19801
      Attention: Tom Francella and Dennis Shaffer
      Facsimile: 302.357.3272
      Email: _____

If to the Buyer, to:

      _____

      _____

      _____

      Attention: _____

      Facsimile: _____

      Email: _____

      with a copy to (which shall not constitute notice):

      Reed Smith LLP
      1201 North Market Street
      Wilmington, Delaware 19801
      Attention: Kurt Gwynne, Esquire
      Facsimile: (302) 778-7575
      Email: kgwynne@reedsmith.com

Each Party entitled to notice may change the address to which notices, requests, demands, Claims and other communications hereunder are to be delivered by giving all other Parties notices in the manner herein set forth.

      Section 12.7    **Severability**.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify

this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 12.8   **Binding Effect Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for Sellers' estates or any trustee appointed in a chapter 7 case if the Bankruptcy Cases are converted from chapter 11. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided in this Section 12.8.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers, on the one hand, or Buyer, on the other hand, (by operation of law or otherwise) without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Buyer intends to (and may, without the consent of Sellers) assign its rights, interests, and obligations hereunder to one or more of its designees; provided, further, that no such assignment by Buyer to any such designee(s) shall relieve Buyer of its obligations under this Agreement prior to the Closing, which shall remain binding upon Buyer until the Closing (and after the Closing Buyer shall have no obligations under this Agreement).

Section 12.9   **No Effect Upon Lending Relationships**.   Notwithstanding anything contained in this Agreement to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of Frozen Foods LLC and Siena lending Group LLC in each of their respective capacity as lenders to Sellers.

Section 12.10 **Counterparts**.   This Agreement may be executed in one or more counterparts (including by facsimile or electronic mail), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**

**GOURMET EXPRESS, LLC**

By: _____
Name:
Title:

**GOURMET    EXPRESS    ACQUISITION FUND, LLC**

By: _____
Name:
Title:

**GOURMET EXPRESS HOLDINGS, LLC**

By: _____
Name:
Title:

**BUYERS:**

**GENESIS MERCHANT PARTNERS, LP**

By: _____
Name:
Title:

**GENESIS MERCHANT PARTNERS II, LP**

By: _____
Name:
Title:

*No. 2134766-v.1*

*2133607v6*

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]